ROSA SMITH, *Appellee*, v. THE WICHITA TRANSPORTATION CORPORATION, *Appellant*.

No. 40,067

WICHITA TRANSPORTATION CORPORATION, *Appellant*, v. ROSA SMITH, *Appellee*.

(293 P. 2d 242)

Opinion filed January 28, 1956.

*Robert C. Foulston,* of Wichita, argued the cause, and *George B. Powers, Samuel E. Bartlett, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Malcolm Miller, Robert N. Partridge* and *Robert M. Siefkin,* all of Wichita, were with him on the briefs for the appellant.

*John C. Frank* and *Garner E. Shriver,* both of Wichita, argued the cause, and *Dale M. Bryant, Morris H. Cundiff* and *Glenn J. Shanahan,* all of Wichita, were with them on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, J.: These cases originated in the district court of Sedgwick County. Case No. 39,650 was commenced by Rosa Smith against the Wichita Transportation Corporation, a public carrier, to recover damages sustained by her as a result of being run over by one of the carrier's motor busses while attempting to board such vehicle at a regular bus loading zone located on the south side of Kellogg and east of Hydraulic streets in the city of Wichita. Plaintiff prevailed and the defendant appeals. Case No. 40,067, although stemming from Case No. 39,650, was an independent action for a new trial, brought by the carrier against Rosa Smith under the provisions of G. S. 1949, 60-3005 and 60-3007 to 3016, Incl. The relief sought was denied and the plaintiff appeals.

When the appeals reached this court they were docketed under separate numbers. Thereafter, on joint application of the parties, they were consolidated by order of this court for purposes of argument and decision. In view of the nature of the issues involved we think that action was ill-advised. However, it cannot now be rescinded and we must make the best of it. For that reason, each case will be considered separately although both will be disposed of in this opinion. Therefore, until otherwise indicated, what will be stated has reference to Case No. 39,650.

The pleadings are not in question, hence no attempt will be made to detail their contents. For all purposes here pertinent it may be said that each party charges that negligence on the part of the other was the cause of the involved accident.

With issues joined as just indicated the cause came on for trial

by a jury which, at the close of a long and spirited trial, returned its general verdict in favor of plaintiff for the sum of $50,000.00 along with answers to twelve submitted special questions which read:

"1. Was Rosa Smith standing within the bus loading zone when the bus came to a stop? Answer: Yes.

"2. Did Rosa Smith place her foot on the step of the bus before the bus started? Answer: Yes.

"3. Did the bus start with door open? Answer: Yes.

"4. Did the bus start with a sudden and violent lurch or jerk? Answer: Yes.

"5. Was the starting of the bus while the plaintiff was actually stepping on the steps of the bus the cause of plaintiff's fall? Answer: Yes.

"6. Was the plaintiff running along the sidewalk at the side of the bus after the bus started in motion? Answer: No.

"7. Was the fall and injury caused by the negligence of the plaintiff? Answer: No.

"8. If you answered the above question 'yes,' state the negligence of the plaintiff. Answer:

"9. Was the proximate cause of the plaintiff's fall the negligence of the bus operator? Answer: Yes.

"10. If you have answered the above question 'yes,' state the negligence of the bus operator. Answer: Failure to observe passenger coming aboard.

"11. Was the proximate cause of the injuries the result of the negligence of both parties? Answer: No.

"12. Was this an unavoidable accident? Answer: Could have been avoided."

In due time the defendant filed a motion to set aside the answers to special questions and a motion for a new trial. Subsequently the trial court overruled such motions. It then approved the general verdict and rendered judgment in accord therewith. Thereupon defendant perfected its appeal and brought the case to this court under specifications of error permitting consideration of the matters it now states are the questions involved on appellate review.

At the outset it should be stated the tenor of all claims advanced by appellant in support of the principal questions raised as the basis for its position the judgment should be reversed and a new trial granted is of such nature that it requires an analysis of the evidence adduced at the trial. With that in mind we have carefully examined a long and complicated record and shall now, in highly summarized form, give our version of what is to be there found with respect to the evidence and matters deemed by us to be decisive of the rights of the parties.

On August 31, 1951, at about 8:10 a. m., a dry clear day, appellee, a fifty-two year old woman, was attempting to get aboard one of the appellant's passenger busses, weighing 16,100 pounds, at a bus loading zone, located as heretofore indicated, when she either fell or was thrown under the wheels of that vehicle, which ran over her body and caused the severe and permanent injuries presently to be described.

Claims of the parties respecting the cause of the accident are highly conflicting.

Appellee's position, supported by her own testimony and that of one corroborating eyewitness, is that she was standing in the bus loading zone when the bus approached and stopped; that she went to the front door, the loading door of the vehicle, and attempted to board; that such door was open and she could see the bus driver who was looking back over his shoulder out of the window, in the opposite direction to the north and west; that just as she got her right foot up on the bottom step of the bus and had her left foot about off the pavement the bus started up with such a rush that it threw her back into a bus stop sign with such force she bounced back under the bus and was run over by one of its wheels; and that she had no conscious recollection of anything that happened thereafter until some time later.

Appellant's position is that appellee had not reached the loading zone at the time the bus made its stop but on the contrary was seen running across Kellogg street from the north and to the rear end of such bus after it had stopped at the loading zone with the intention of reaching and boarding it before it left such zone. Its evidence on this point is supported by the bus driver who testified he saw no one in the loading zone as his bus approached that location or when he stopped to let off a passenger. It is also supported by the testimony of three women passengers on the bus, and by one other lady who happened to be standing in a doorway of a business establishment located on the east side of Kellogg street directly across from the point where such bus had stopped, all of whom testified in substance that as the bus stopped they saw a gray haired woman running across Kellogg street from the north who passed the rear end of the bus and disappeared from their view. At least one and perhaps more of the passengers said that as this woman came around the right rear end of the bus she began pounding on the rear west side thereof and called for the

driver to stop. The appellant produced no eyewitnesses to the accident and none of its witnesses purported to identify appellee as the woman they had seen running across Kellogg street. As a matter of fact, appellee produced witnesses who testified her hair was not gray and that on the morning in question her head was covered by a scarf.

Appellant introduced evidence to the effect that immediately after the accident, and before she had been removed from the point where it occurred, appellee made statements consistent with its theory that she was the person whom three witnesses had seen running across Kellogg street just prior to the accident. On the other hand appellee, who as we have heretofore indicated had stated she remembered nothing after the accident occurred, produced witnesses who said they were present at the time and heard her make no such statements. She also adduced expert medical testimony to the effect that due to extreme shock it was inconceivable she would have been coherent at that time and that if she were conscious her condition was such statements made by her could not be relied upon.

During the course of the trial a bitter controversy developed between counsel for the respective parties over a missing police report wherein the officer making such report had stated that immediately after the accident appellee had made statements of the character above indicated and then, when testifying at the trial as a witness for appellant, stated that he did not recall her having made any such statements. This witness also testified that, although he believed appellee was conscious after the accident she was in a severe state of shock; that she was mumbling unintelligibly and was very incoherent; that he asked her name while they were waiting for the ambulance and that she was unable either to understand him or unable to answer; and that she remained in that condition all the way to the hospital while he was with her in the ambulance.

We regret another matter must be mentioned and that only because counsel themselves have made it necessary. The record, as well as the briefs and arguments, disclose numerous charges and countercharges on both sides with respect to the integrity of the witnesses, the credibility to be given their testimony, and the good faith and conduct of counsel prior to and throughout the course of the trial. We are not disposed to here detail such charges. For

our purposes it suffices to say the record discloses they were all presented and argued during the trial in such manner and form that both the court and jury were fully cognizant thereof and we can assume that the jury in reaching its verdict and the trial court in overruling the motion for a new trial not only gave them full and complete consideration but determined the force and effect to which they were entitled in reaching their respective decisions.

What has been heretofore related, while it is not intended to and by no means covers all the facts of record, is sufficient to demonstrate there was substantial competent evidence to support the answers to the special questions and the jury's general verdict. Therefore, since under all our decisions it is not the function of this court to pass upon the credibility of witnesses or the weight to be given their testimony, it cannot be successfully argued that the judgment should be reversed on the basis of lack of evidence to support it.   It should be added that except for one point to be subsequently mentioned and discussed appellant makes no serious contention to the contrary.

The first contention of appellant with respect to the trial court's action in overruling the motion for a new trial is that it abused its discretion in making that ruling because the verdict was clearly contrary to the overwhelming weight of the believable evidence. The mere stating of this contention makes it obvious that if we were to sustain it we would have to test the credibility of the witnesses, weigh the evidence and assume the position of the trier of the facts.   That, as we have heretofore indicated, is the very thing our long line of decisions holds we cannot do.   See, e. g., *Dunn v. Madden,* 109 Kan. 94, 197 Pac. 1116, where it is said:

".   .   . The rule consistently followed in this court for more than a half century is that this court on appeal cannot weigh conflicting evidence nor pass upon the credibility of witnesses.   That is the function of the jury who are in a better attitude than this court to determine these questions.   We cannot set aside the finding of a jury based on conflicting testimony because of the greater number of witnesses who gave adverse testimony nor because the evidence in record form may seem to us to preponderate against the finding.   .   .   ." (pp. 95 and 96.)

For one of our more recent decisions dealing with the same subject see *Stoskopf v. Stoskopf,* 173 Kan. 244, 245 P. 2d 1180, and the numerous authorities therein cited.

Another contention advanced by appellant is that the trial court abused its discretion in overruling its motion for a new trial be-

cause "the entire records show a pattern of untruthfulness, falsification of records and a scheme amounting to a gross miscarriage of justice." The trouble with this contention, from appellant's standpoint, is that after a careful and extended examination of the entire record we do not believe it can be construed in accord with its views. It follows the trial court did not abuse its discretion in reaching a like conclusion.

It is also claimed the trial court abused its discretion in overruling such motion when facts were before it which could not have been placed before a jury. Our view is that appellant has failed to affirmatively establish its position on this point. Moreover, in the face of a record disclosing that during the trial the court exercised the utmost liberality in permitting appellant to introduce any and all evidence it deemed necessary to its defense, we refuse to believe such court would have approved the verdict and denied the motion for new trial if it had been presented with facts sufficient to convince it appellant had not received a fair trial.

Another claim respecting error in the overruling of the motion for a new trial is that the verdict was so grossly excessive as to indicate passion and prejudice. This claim has not been mentioned or discussed up to this point because it can be determined along with appellant's final contention the trial court erred in approving the verdict of the jury as to amount when the same was so excessive as to shock the conscience of the court. We therefore give our attention to those matters, noting as we do so that appellant introduced no testimony in connection therewith and that the evidence on which their decision must depend is uncontroverted. Here again, since neither of the parties has seen fit to summarize the testimony having to do with the subject, our statement with respect to pertinent evidence relating thereto will be based in the main upon our version of what the record discloses and is in no sense to be construed as covering everything to be found therein.

On the morning of the accident in question appellee was a woman fifty-two years old with a conceded life expectancy of 19.49 years. She had always had excellent health and had never been to a doctor or in a hospital. She was employed as a domestic and maintained a home for her minor son and daughter. Her wage rate was $1.00 per hour, lunch and transportation, and when she had employment she usually worked seven and one-half to eight hours per day. Her average earnings a month or two before the accident were about

$40 per week. Before the accident occurred she went fishing with her sons, bowled, attended dances and church, and took her grandchildren to the park which was a mile from her home. Since the accident she cannot do any of such things; cannot stand to have her grandchildren around because it makes her too nervous; has lost her home and now has to live from place to place with her children; does not now go out in public very much because of the pain and embarrassment of being a cripple; and is unable to carry on her former work as a domestic. So much for the testimony of Mrs. Smith, which has been limited to a very general statement inasmuch as we believe the nature of her injuries, the extent of her pain, suffering and disability, and the expenses incurred by her as a result of the accident should be based upon the testimony of witnesses who can be classified as having no interest in the lawsuit.

Leo Crumpacker, a physician and surgeon and specialist in surgery, who was at the hospital when appellee arrived there in the ambulance and was the first to see and examine her, described her condition on arrival as follows:

"I found a female woman—I don't know her exact age—but she appeared to be somewhere in her forties, lying on a stretcher. There were multiple areas of injury over her body. Her skin was cool and moist. She was in a dazed-mental state. Her eyes were glassy. There was an obvious deformity of the right chest, and when the right chest was palpated with the hand, multiple fractures of the ribs could be felt. There was an injury and laceration of the right forearm; there was a fracture of the forearm as could be demonstrated by feeling; there was an accumulation of fluid which was beginning to take place over the right anterior medial aspect of the abdomen, extending down on to the thigh and around the buttocks; there were multiple areas of abrasions and contusions over the body. Her blood pressure was low. She had injuries involving the right chest, which you could feel the end of the ribs rubbing together, what we call crepitation down over the right side of her abdomen, extending down and around the right hip. There was softness of the tissues indicating there was the beginning of a collection of fluid in underneath, and in examining the pelvic region on the right you could feel a little crepitation there. There was deformity of the right leg—rotating with the foot out in that manner (indicating), and her blood pressure was sixty over nothing at first."

Later in his testimony this same witness testified, among other things, that Mrs. Smith was very critically ill and that there was question in his mind whether she was going to live from one moment to the next; that literally she was bleeding into her tissues; that the fluid was collecting in the large injured area on the right side of her body at such a rapid rate they could hardly replace the fluid

going into this area through two needles in her veins; that it was blood that collected in the injured tissues and resulted in a condition known as hematoma; that after giving her vigorous emergency treatment he turned her over to Dr. Bowman, an orthopedist, a bone specialist, and Dr. Buck, a chest specialist, associates in his office, because of her extreme chest and bone injuries; and that he saw her some weeks later after she was pretty well along because of a rectal condition she developed as the result of being in bed and all the enemas she had.

Ben H. Buck, Jr., a chest specialist, testified in part as follows:

". . . I first saw Rosa Smith with Dr. Crumpacker while she was in the emergency room at the hospital. I examined her while she was in the emergency room. My preliminary examination was to ascertain whether the lung had been injured enough to cause it to collapse. She had fractured ribs. When I first saw her she was in shock and was being given fluid in order to combat the shock. She was lying on the table and was moaning and groaning but primarily she was in shock. I examined her ribs and found that there were several fractures of the ribs. When I first saw her it was shortly after 9:00 o'clock. I do not believe she would have been able to be very coherent shortly after the accident. I took X-rays showing the right chest at St. Francis Hospital. The first eleven ribs were the ones involved. Mrs. Cocke, Dr. Bowman's nurse made a sematic drawing of the chest in this case. We splinted her chest so that she could breathe a little better and put sand bags on the right side of the chest. It is hard to splint fractures in the chest because of the constant motion of the lungs underneath. I saw Mrs. Smith in the hospital several times during the next several weeks. I took an X-ray of Mrs. Smith's chest on April 6, 1953. It shows a deformity in the uniting of the ribs. The ribs were not exactly together when they healed. They were probably offset somewhat. That explains the way they are healed. There is a good bone between them now but they are not perfect as to shape. I believe the ribs are healed as well as they ever will be at this time. There is a small intercostal nerve along the lower border of the ribs. It is conceivable that bony pressure or involvement of this nerve could cause pain."

A portion of the testimony of Harold S. Bowman, an orthopedic surgeon, reads:

". . . I treated Mrs. Smith. I first saw her on August 31, 1951, at the request of Dr. Crumpacker after she had been admitted to the St. Francis Hospital. I examined her after I arrived at the hospital.

"She was desperately ill, was in shock, she was receiving oxygen and had been receiving intravenous fluids and had a deformity of the right chest. She had a splint on the right arm and the pelvis on the right side was high in regard to the left. X-rays were made on the 3rd of September, 1951. X-rays showed a fracture of all the rami of the pubic bones, a dislocation of the right sacroiliac joint and the pelvis had been pushed up on that side about three inches. They show a transverse fracture in the lower part of the middle third

of the right radius. An X-ray taken January 5, 1952, shows the fracture of the radius, the lateral bone of the arm and shows the union of the fracture in good position. I took X-rays of Rosa Smith on April 6, 1953. She had been home a little over a year at that time. The X-rays showed the lower portion of the spine, hips, the ilium, rami, the ischium, and the sacrum. It shows the ilium on that right side during the interval of time since I had last seen her had been redisplaced upwards. Another X-ray taken on April 6, 1953, shows the same thing that the other X-ray shows but does not include the lumbar spine. It shows the fracture of the displacement of this area apparently having reunited. I also took X-rays on March 16, 1954. It shows that the fractures have stabilized themselves in the same position as they had a year previous. The right hip at the sacrum is pushed up in the neighborhood of an inch and a half. I don't expect the position of the bone will change and the fibrous tissue will remain in the present position. We put splints on the forearm the day of the accident trying to keep the extremities quiet so that there would be little damage to the soft tissues. On September 5, we closed the laceration on the forearm and placed the right arm fracture in a cast. We attempted to set the bone to the pelvis and hip on September 6, 1951. This was done by the use of traction and splints as shown by the photographs plaintiff's Exhibit 9. We got up to thirty pounds of weight but finally had to drop it down to just below twenty pounds. There was pain in the early part of traction but after a person becomes stabilized, the pain decreases and moves away. I saw Rosa Smith in my office on March 16, 1954. The symptoms were relatively the same. I do not think she can work. She can only be on her feet a few minutes and then have to sit again. She is able to walk a block or two. The bill of Dr. Buck, Dr. Crumpacker and myself is in the amount of $1,315.00. It would be a good thing for her to have periodic checkups for the next year or two. It is possible she might be hospitalized in the future. I can only give an estimate that she might have $1,000.00 worth of expenses in the future. It is just a guess. The traction was removed on November 15, 1951. She was discharged from the hospital on January 6, 1952."

Dorothy Stotts, a registered nurse and supervisor on the Fourth Floor at St. Francis Hospital, where appellee was a patient, was called as a witness and stated that she recalled Rosa Smith as a patient and saw her every day when on duty during the time she was in the hospital. Among other things she testified that when Mrs. Smith was admitted to the hospital she was very critically injured and in a very serious condition; that she was on duty every day of the 129 days appellee was in the hospital; that during a part of the time (which we pause to note other portions of the record disclose was 12 weeks), she was strung up in traction, which required a great deal of tedious care, cautious treatment, and no sudden motion; that a great deal of pain is connected with a patient under that treatment; that such pain is nerve-racking because it is a

constant pull causing pain; that appellee had muscle spasms as a result of traction; that due to her condition putting clean linens on the bed and giving her a bath was a long, tedious and painful procedure; that it required a number of people to do it; and that very rarely could she have one of the nurses touch her without pain.

We have searched the abstracts and briefs submitted and, except for claims made in the petition, fail to find any reference to expenses other than doctor bills incurred by appellee as a result of the accident. However, the record does disclose the use of an ambulance, the use of the hospital for 129 days and the use of some private nurses. Inasmuch as we are here concerned only with the size of the verdict we think we can take judicial notice of the fact that such services are not furnished gratuitously to a hospital patient and may safely assume that as charged in the petition those expenses are in excess of $1,500.

We are not disposed to review the many cases cited by counsel for the parties dealing with other situations where questions relating to the excessive status of a verdict have heretofore been discussed, considered and determined. Readers of this opinion interested in such decisions will find many of them cited and discussed in our recent decision of *Knoche v. Meyer Sanitary Milk Co.*, 177 Kan. 423, 280 P. 2d 605. Nor are we inclined to here labor the strenuous arguments made by counsel in behalf of their respective clients, all of which have had our considered attention, regarding their views as to whether the involved verdict and judgment should be set aside as excessive. It suffices to say that, after an exhaustive review and careful examination of the entire record, taking into consideration the age of the appellee, her life expectancy, her probable loss of earnings, the nature of her injuries and their permanence, and the pain and suffering which she has endured and will continue to endure from those injuries and the treatment thereof; and considering amounts of verdicts for somewhat comparable injuries, heretofore approved by this and other courts, in the light of increased cost of living and the impaired purchasing power of money, we have concluded it should not be said the amount of the involved verdict, even though it is for a substantial amount and must be considered as quite liberal, is such as to shock the conscience of this court or that such verdict should be set aside or disturbed as excessive.

And on the basis of the conclusion just announced, since all arguments with respect thereto are founded on its amount, we are forced

to hold appellant's contention the trial court abused its discretion in refusing to grant a new trial on the ground the verdict was so grossly excessive as to indicate passion and prejudice on the part of the jury cannot be upheld.

We now direct our attention to the separate and independent action (Case No. 40,067) brought by the carrier on March 25, 1955, which we pause to note was almost a year after the rendition of the verdict in Case No. 39,650, under the provisions of G. S. 1949, 60-3005 and 60-3007 to 3016, Incl.

This action was commenced by the filing of a petition wherein, after stating the facts relied on, plaintiff prayed for the granting of a new trial and the vacation of such judgment on the basis of newly discovered evidence and fraud practiced by the successful party in obtaining such decree. Thereafter, although the statute (G. S. 1949, 60-3011) does not require it, defendant (Rosa Smith) filed an answer in the form of a general denial, which joined issues on all grounds for relief relied on in the petition.

In due course the cause came on for hearing before the trial judge who had rendered the initial judgment and the plaintiff adduced its evidence. Thereupon the defendant demurred to such evidence on the ground it did not disclose grounds for a new trial or show facts sufficient to vacate the judgment. Counsel for defendant then stated he desired to introduce the record of testimony in the case in which the judgment was rendered. After an inquiry by the court as to whether there was objection to admission of such record counsel for plaintiff stated it was not proper on a demurrer but if defendant was going to introduce part of her case it was all right, but certainly not on the demurrer. The court then admitted the record and, following argument by counsel respecting the evidence produced at the trial, rendered its decision sustaining the demurrer and then, according to the journal entry which is approved by counsel, signed by the court and hence must be assumed to be correct, denied the petition for a new trial and rendered judgment taxing the costs of the case to the plaintiff. Plaintiff brings the case to this court, under specifications of error, charging that the trial court erred in sustaining the demurrer to the evidence, in rendering judgment in favor of defendant, and in refusing to grant a new trial.

At the outset the issues can be simplified by stating that counsel for appellant, although insisting badges of fraud are visible, concede the evidence adduced at the hearing was not sufficient to

warrant a new trial on that ground and state that for that reason their arguments will be limited to the grounds of newly discovered evidence. We shall proceed accordingly.

Appellant raises some questions regarding the propriety of the ruling on the demurrer. Since, under the existing facts and circumstances, they are not decisive nothing would be gained by considering them and we are not inclined to prolong this opinion by discussing them. Assuming, without deciding, that the sustaining of the demurrer was unwarranted the fact remains the record discloses the trial court took action on the petition for a new trial by denying it and in connection therewith followed the procedure and considered everything required by our decisions. See, e. g., *Boyer v. Champeny*, 133 Kan. 434, 437, 300 Pac. 1069, where it is said:

"The statute above quoted (now G. S. 1949, 60-3005), with other provisions of the code relating to proceedings for a new trial, make it the duty of the court, in passing on a petition for a new trial such as was presented in this case, to consider the pleadings and evidence offered at the trial as well as that offered in support of the petition for a new trial, and upon the whole case to determine whether the decision given at the trial was wrong. (*Haughton v. Bilson*, 90 Kan. 360, 133 Pac. 722.). . . .

"Evidence offered in support of a petition for a new trial should be considered on the same basis as though it were offered on a motion for a new trial, the only difference being that if it is discovered after the three days provided for the filing of a motion for a new trial it may be considered and presented by the court under a petition for a new trial. Naturally the new evidence offered should be material, ordinarily should not be simply cumulative or impeaching, and the party presenting it should make a showing that with reasonable diligence he could not have discovered the evidence in time to have presented it at the trial." (p. 437.)

We pause to here note that in following the procedure outlined in the decision from which we have just quoted the court was operating under and governed by the provisions of G. S. 1949, 60-3004, which, so far as here pertinent, read:

". . . A new trial shall not be granted as to any issues in a case unless on the pleadings and all the evidence offered at the trial and on the motion for a new trial the court shall be of the opinion that the verdict or decision is wrong in whole or in some material part. . . ."

We further note that when the quoted provisions of the foregoing statute are given full force and effect they compel the conclusion that when a petition for a new trial has been denied the decisive appellate issues involved are limited to questions relating

to whether the trial court erred in failing and refusing to find the verdict or decision complained of was wrong.

From what has been heretofore stated it can now be said that, looking through form to substance, the essence of every material contention advanced by appellant in support of its position the court erred in denying the new trial and rendering judgment against it is that the nature of the newly discovered evidence presented to the court was such as to require it to grant a new trial. Let us see.

Upon resort to the record it appears that in reaching its decision the court had before it all the evidence adduced at the trial in which the verdict was rendered as well as the newly discovered evidence; that it reviewed the new evidence on which appellant was asking for a new trial in the light of the old record and announced two conclusions. In substance one of such conclusions was that some of such evidence related to conversations between two strangers to the lawsuit, in no sense binding upon the appellee, and could not be admitted if a new trial was granted. The other was that the remainder of the evidence presented was cumulative, in that it supported a theory in the case and before the jury throughout the trial, i. e., that appellee was running toward the bus at or about the time of the accident, and therefore afforded no sound basis for the granting of a new trial.

The rule that newly discovered incompetent evidence is not a ground for the granting of a new trial is so elementary that it requires no citation of the authorities supporting it. The rule that cumulative evidence does not warrant such action is also well-established. See, e. g., *Sheahan v. Kansas City,* 102 Kan. 252, 169 Pac. 957, which reads:

"A party is not entitled to a new trial on the ground of newly discovered evidence, where the new evidence is of the same kind and goes to the same point as that offered on the trial." (Syl. ¶ 2.)

See, also, *Mourning v. Harrison,* 154 Kan. 242, 118 P. 2d 558.

We now turn to the newly discovered evidence on which the court refused to grant a new trial, noting as we do so that it would add nothing to this opinion or the body of our law to detail or discuss it. Indeed, we see no necessity for laboring any of its aspects. It suffices to say that after a thorough and painstaking analysis of all such evidence we are convinced the trial court was not only correct in the conclusions reached by it respecting the character of such evidence but properly decided that none of it was of such

force and effect as to afford sound grounds on which to base a ruling granting a new trial. It follows the record discloses no error warranting a disturbance of that ruling or a reversal of the judgment.

The judgments rendered by the trial court in Case No. 39,650 and Case No. 40,067, are each affirmed.