232 Kan. 404 (1982)
656 P.2d 154
FRANK J. MERANDO, Appellee,
v.
THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Appellant.
No. 53,532
Supreme Court of Kansas.
Opinion filed December 29, 1982.
Leonard O. Thomas and David K. Fromme, of Weeks, Thomas & Lysaught, Chartered, of Kansas City, argued the cause, and Paul R. Hoferer, of Topeka, was with them on the brief for appellant.
Payne H. Ratner, Jr., of Ratner, Mattox, Ratner, Barnes and Kinch, P.A., of Wichita, argued the cause, and William L. Roberts, of Kansas City, was with him on the brief for appellee.
The opinion of the court was delivered by
MILLER, J.:
The plaintiff, Frank J. Merando, was injured while employed as a switchman for the defendant, the Atchison, Topeka and Santa Fe Railway Company (Santa Fe) at Topeka, Kansas. He brought suit in Wyandotte District Court under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., and following a jury trial recovered a judgment against the Santa Fe for the sum of $529,200. From that judgment and the overruling of its post-trial motions, the Santa Fe appeals. We will first set forth the facts and then discuss the nine issues raised.
The plaintiff was injured while switching freight cars in the Santa Fe yards in Topeka, Kansas. The switchyards lie generally between 4th Street and 8th Street; there are thirteen tracks used in the switching operation. These tracks run north and south, slope downward toward the north at approximately 0.146 percent grade, and are generally parallel to each other. All of the tracks come together north of 4th Street and south of 8th Street to form a single "lead" track.
Switching involves the use of an engine to move cars onto different tracks. There are two procedures used, "shoving" and "kicking." In shoving cars, the engine is coupled to the cars to be moved; it then backs onto the lead track with the cars attached; the appropriate switch is opened; the engine pushes the cars onto the desired track, to the desired location. The engine is then uncoupled and backs out to the lead track. In "kicking," the procedure here involved, the engine pulls the cars onto the lead track, the proper switch is opened, and the engine reverses direction. After the slack is out of the line, a member of the crew uncouples the cars to be "kicked." The engine pushes them forward; when the proper speed is reached, the engine stops and backs out onto the lead track; the disconnected cars continue their forward progress and roll onto the desired track.
On December 22, 1978, plaintiff was assigned as area foreman of a switch crew working in the south end of the Santa Fe yards. *406 Another crew was assigned to the north end of the yards; the two crews were aware of each other but were not informed of each other's assignments. Each had a list of the cars his crew was to switch; these lists were prepared by the yardmaster.
About 4:30 o'clock that afternoon, plaintiff instructed the engineer on his switch engine to move onto track 112. Plaintiff crossed the yards, apparently to a point between tracks 112 and 113. He observed three freight cars on track 113; when he first saw them, they were standing still. His crew had not placed them there. In a few minutes, he noticed that the three cars were rolling toward the north. There is a grade crossing at 4th Street, and serious injury and damage could be caused if unattended cars are permitted to roll to the north. Plaintiff looked to the north, saw no approaching cars, and started to board the southernmost of the three cars in order to apply the hand brake. Just as he began to board the car, a cut of several freight cars which had been kicked south onto track 113 by the other crew collided with the northernmost of the three rolling cars. Plaintiff was thrown to the ground by the force of the impact, and both of his feet were severely injured by the wheels of one of the cars. He sustained broken bones in one foot and a severe crushing injury to the other. One toe was amputated. The full thickness of most of the skin on one foot had to be removed and was replaced by skin grafts from plaintiff's thigh. His legs were pinned and his feet were suspended in mid-air until the grafting operations were completed and the surface of his feet had healed. Medical testimony indicated that this was an extremely painful procedure. Plaintiff was in the hospital for several months and off work for well over a year. He has functional impairment of both feet and future difficulty with his feet is likely.
At trial, the Santa Fe contended that plaintiff was contributorily negligent in failing to see the freight cars approaching from the north. Plaintiff contended that the railway was negligent in failing to apply the hand brake or "tie down" the three cars kicked onto track 113, in kicking the next cars at an excessive speed, in switching cars at both ends of the track without providing a clear understanding to all crew members of the movements to be made by the respective crews, and in failing to comply and to require compliance with all safety rules. The jury returned a total verdict of $630,000 and found plaintiff 16% *407 negligent and the railway 84% negligent. A judgment of $529,200 for plaintiff resulted.
1. The first issue raised by the appellant is that the trial court erred in refusing to hear evidence of juror misconduct and in failing to order a new trial for juror misconduct. This claim is based on similar affidavits of two jurors.
The trial court properly instructed the jury that contributory negligence by a plaintiff does not prevent recovery, but does reduce his damages. This is in accord with the applicable federal law, 45 U.S.C.A. § 51 et seq. The court then instructed the jury that if it found that plaintiff's injury resulted in whole or in part from the negligence of both the plaintiff and the railroad, it should proceed first to determine the amount of plaintiff's damages without considering the effect of plaintiff's negligence. Next, it would determine what percentage plaintiff's negligence was of the total negligence. Finally, it would reduce the plaintiff's damages by the percentage of his negligence. The jury was thus able to see precisely what their finding of percentage of negligence on the part of the plaintiff would do and exactly what judgment would result. The court's instruction in this regard was the usual one given in FELA cases where contributory negligence of an employee is claimed. See PIK Civ.2d 16.31 (1977). It parallels the practice of advising a jury of the effect of its answers to special questions in comparative negligence cases, a practice we approved in Thomas v. Board of Trustees of Salem Township, 224 Kan. 539, 550-551, 582 P.2d 271 (1978). The special verdict form submitted by the Court followed its instruction referred to above. The jury was told to find (1) the total damages, (2) the percentage of the total negligence attributable (a) to Frank J. Merando and (b) to the Santa Fe, and (3) to deduct the percentage of plaintiff's negligence from the total damages and thus to compute plaintiff's net award.
The affidavits of the two jurors indicate that the jury did its calculation in reverse. It first determined item 3, the net award the jury wanted plaintiff to receive. Next, it determined what percentage that sum was of the total amount plaintiff claimed and found that percentage to be 84%. It then assigned 84% negligence to the Santa Fe and 16% negligence to the plaintiff. Finally, it assigned as the total damages sustained the entire amount requested by plaintiff's attorney. The amount awarded to plaintiff *408 was the amount the jurors had agreed upon. One juror says: "At one point, we had attempted to pick a percentage of fault to apportion to each party, but we found that it was impossible for everyone to agree on a figure." The other juror says: "The jury never decided on a percentage of fault to attribute to either party."
Eleven jurors agreed to the verdict. It is regular and complete on its face. It fixes total damages at $630,000, plaintiff's negligence at 16%, the railroad's negligence at 84%, and plaintiff's net award at $530,000. (The trial court, with the jury's permission, corrected the latter figure to $529,200, which is actually 84% of $630,000. No complaint is made of that change. Judgment was entered for the corrected sum.)
Appellant contends that the jurors, in arriving at the amount plaintiff was to receive, used an unacceptable method which amounts to a "quotient verdict." We do not agree. The jurors wrote down the approximate figure each thought the plaintiff should receive. The foreman added those figures and divided by twelve. The result was about $500,000. To this the jury added $30,000 (one juror's affidavit states that this was to reflect plaintiff's actual wage loss) and the jurors then agreed upon $530,000 as the amount plaintiff was to receive. The affidavits do not indicate that the jurors agreed in advance to be bound by the average figure. Such an agreement is the evil which courts have found objectionable and which impeaches the verdict and subverts the deliberative process by which jurors must arrive at their verdict. See Foster v. City of Augusta, 174 Kan. 324, 329-330, 256 P.2d 121 (1953), and Johnson v. Haupt, 5 Kan. App.2d 682, 686, 623 P.2d 537 (1981). Jurors may average their suggested awards so long as there is no prior agreement to be bound by the result of mathematical computation. See the cited cases and also Zook v. State Highway Comm., 156 Kan. 79, 81, 131 P.2d 652 (1942), and cases there cited. There was no evidence here of any antecedent agreement of the jurors to be bound by the averaging process. We find that there was no quotient verdict.
The appellant contends that the affidavits show misconduct on the part of the jury which, if established, requires the verdict to be set aside. In this regard appellant relies upon our recent holding in Verren v. City of Pittsburg, 227 Kan. 259, 260, 607 P.2d 36 (1980). There the affidavits stated that:

*409 "[T]he jury in its computation of damages specifically apportioned an amount included within its total amount of damages for plaintiff's attorney's fees...."
and additionally that the jury considered the percentage of fault and took that percentage into consideration in order to allow plaintiff a predetermined net recovery for his damages. Attorney fees had not been disclosed in the evidence. The jury had been told the matters it could consider in arriving at its verdict; attorney fees was not one of the items enumerated. We said:
"The amount plaintiff had to pay for attorney fees was not one of the items of damage included, yet if the facts in the affidavits are proven an amount for attorney fees was included as part of the damages. This court specifically holds in Dunn v. White, 206 Kan. 278, 479 P.2d 215 (1970), that it is misconduct for the jury to add to the damages the amount of possible attorney fees which plaintiff will have to pay." 227 Kan. at 263.
The Verren jurors were told in Instruction No. 7 by the trial court to disregard the question of fault in arriving at the full damage figure. In discussing the method employed by the jurors in arriving at their verdict, we said:
"Now, if we assume the truth of the affidavit, the jurors were guilty of misconduct in that they consciously disregarded the instructions of the court. They conspired together so as to circumvent the comparative negligence law. In total disregard of Instruction No. 7, they did consider the question of fault of plaintiff and increased the amount of actual damages to a fictitious figure which would result in giving the plaintiff the entire amount of his actual damage plus attorney fees. No evidence was introduced on the amount of attorney fees and such an item would have to be mere speculation." (Emphasis supplied.) 227 Kan. at 263.
The primary wrong disclosed by the affidavits in the conduct of the Verren jurors was the inclusion in the verdict of a wholly speculative sum for plaintiff's attorney fees. We held that that error, if established, would vitiate the damage award and be grounds for a retrial on the issue of damages.
In the case now before us, the affidavits do not indicate that the jurors went outside the record in considering the extent and amount of plaintiff's damages. No consideration was specifically given to attorney fees and no item representing estimated attorney fees was included in the verdict. According to the affidavits here, the jurors arrived at the net award first, then computed percentage of fault and finally total damages. Eleven of the twelve jurors *410 then agreed upon the verdict. This is a sufficient number to return a verdict. K.S.A. 1981 Supp. 60-248(g).
The subject of inquiry here is the method, the mental process, by which this jury arrived at its ultimate verdict. The jurors utilized that knowledge which the court imparted to them in its instructions  that the total award must be reduced by the percentage of plaintiff's fault. K.S.A. 60-441 provides in substance that when the validity of a verdict is being inquired into, "no evidence shall be received ... concerning the mental processes by which it was determined." We conclude that the trial court was correct in refusing to hear evidence as to the process by which this jury arrived at its verdict.
Theoretically, damages and fault are separate and distinct subjects. From the standpoint of the jury, however, they are interwoven; the damages recoverable depend upon and are governed by percentage of fault. The decision as to damages to be recovered by the plaintiff is intimately related to the jury's determination of fault. The percentages of fault assigned to the parties here is not contrary to the evidence; each party contended that the other's negligence caused the accident and the resulting injuries; there was abundant evidence of causal negligence on the part of both parties. We do not believe that the affidavits here show a conscious conspiracy to circumvent the comparative facets of FELA or of the trial court's instructions. In this case the fact that the jury reversed the order of procedure laid out in the trial court's instructions goes to the mental processes of the jury and is not alone sufficient to impeach the verdict. K.S.A. 60-441.
2. Appellant claims that the trial court committed prejudicial error in permitting Eugene Haughey to testify as an expert on behalf of the plaintiff. Mr. Haughey, a retired switchman with over 34 years of service with the Santa Fe, was endorsed as a witness but was not specifically listed as an expert. When he took the stand and gave his name and address, counsel for the defendant objected if the witness was to be used as an expert. At a bench conference, out of the hearing of the jury, the court overruled the objection and permitted the witness to testify. His testimony concerned, for the most part, the company rules and proper and safe practices in switching cars in the Topeka yards. His testimony was cumulative, in that various other witnesses for plaintiff testified along the same lines. Defendant had several expert witnesses who testified for the Santa Fe and who covered *411 the same subject matter. Defense counsel was well prepared and cross-examined Mr. Haughey thoroughly.
The trial court has discretion to waive its rules and to permit a party to call witnesses who have not been previously disclosed to the opposing party or who have not been listed as experts. When we are called upon to review the trial court's exercise of discretion in permitting such a witness to testify, we must determine whether the opposing party was taken by surprise, whether the testimony is critical or cumulative, and whether or not the opposing party was substantially prejudiced.
The Santa Fe was advised prior to trial that Mr. Haughey would be called as a witness for the plaintiff. An investigator for the railroad interviewed the witness for some forty-five minutes to an hour several days before trial. Mr. Haughey had been a long-time employee of the Santa Fe in the Topeka yards. While so employed he was chairman for his local union and as such represented employees in investigations where rule violations were charged. He was also a former assistant labor commissioner for the State of Kansas. While the Santa Fe was technically surprised when the witness was called upon to testify as an expert, it knew that he was to be a witness and it could not help but know his background and experience and his familiarity with the operating rules and the switchyards in Topeka. The layout of the yards, the operating procedures therein, and the operating rules were all matters of constant interest throughout the trial.
Defendant seeks to analogize this case with Smith v. Ford Motor Co., 626 F.2d 784 (10th Cir.1980). There, a new trial was ordered on the basis of unfair surprise in the presentation of certain expert testimony. The expert in question was a physician who was disclosed to defendant only shortly before trial. His proposed testimony was described in identical terms to the testimony of two other physicians who were also plaintiff's experts. The new witness testified on a particular area of causation with which the other medical experts were unfamiliar. The testimony was described as "crucial, non-cumulative" evidence, a key element in plaintiff's theory of recovery. Ford Motor Company was taken by surprise and was not able to prepare an adequate cross-examination of the new witness. The case at bar is clearly distinguishable. Counsel here was well prepared in the subject matter about which the witness testified and conducted a lengthy *412 and effective cross-examination. Both parties called other witnesses who covered the same subject matter. We find no substantial prejudice. The trial court did not abuse its discretion in permitting the witness to testify as an expert.
3. Appellant next contends that the trial court erred in admitting into evidence four color photographs of plaintiff's foot, arguing that the pictures were gruesome, unnecessary, shocking and inflammatory. Two of the photographs were taken on December 29, 1978, shortly after the injury was sustained; the other two were taken on February 1, 1979, after the healing process was well along. The photographs were used by the treating physician to illustrate and explain the procedures he followed in treating the injury. The photographs, taken by the physician, clearly show the nature and extent of the injuries to the left foot. The photographs here were not necessarily repetitive. We have often said that photographs which illustrate the nature and extent of the wounds sustained by the victim in a criminal case are admissible in evidence, even though they may be gruesome. State v. Johnson, 231 Kan. 151, 643 P.2d 146 (1982). This rule is also applicable in civil cases. See, for example, Kimple v. Foster, 205 Kan. 415, 420, 469 P.2d 281 (1970). We have examined the photographs to which objection was made and do not find them unduly gruesome or shocking. Under all of the circumstances, the trial court did not err in admitting them into evidence. We find no prejudicial error.
4. Appellant contends that the trial court erred in its damage instruction to the jury because it included future medical expenses therein, and appellant contends that there was no evidence upon which to base such an instruction. The appellant objected to the instruction at trial; the trial court found that there was sufficient evidence to indicate that there would be future expense and that specific testimony as to cost was not required. Plaintiff now contends that the defendant has waived any objection to this assignment of error by failing to include it in its motion for a new trial. In support, plaintiff relies on the rule stated in Brick v. Fire Insurance Co., 117 Kan. 44, Syl. ¶ 2, 230 Pac. 309 (1924), which states:
"Errors of the trial court occurring during the trial and which constitute grounds for a new trial, to be reviewable on appeal, must have been brought to the attention of the trial court on a motion for a new trial, and if such errors are not specifically pointed out in the motion or upon the presentation of the motion, and *413 no opportunity is given to the court to reconsider and correct such errors, they will as a general rule be regarded as waived."
Our present rules of civil procedure do not require the filing of a motion for new trial before an appeal is taken. K.S.A. 60-259 provides for motions for new trial. In his Kansas Code of Civil Procedure 2d Annot. § 60-259 (1979), Judge Gard comments as follows:
"The rules under this article do not require the filing of a motion for new trial as a condition for the review of trial errors in an appellate court. This policy, inherent in the federal procedure also, has not been altered by appellate court rules governing procedure on appeal. Even though the requirement of a motion for new trial as a condition precedent to the right of review is abolished such motions will continue to have considerable impact. The policy of the rules is that the right of appeal is independent of the new trial procedure, and that trial errors and erroneous judgments may be reviewed whether or not a motion for new trial has been filed."
While the inclusion of trial errors in a motion for new trial is not a prerequisite to review of such errors on appeal, giving the trial court yet another opportunity to consider the matter is, of course, preferable. Here, the matter was raised below and, while not included in the new trial motion, is properly before us.
We have carefully reviewed the record and find that there is some evidence that plaintiff will have future medical expenses. Two physicians testified that the extensive area of skin graft on plaintiff's foot will in all likelihood continue to cause difficulty. This is due in part to the hypersensitivity of the foot and the propensity of the skin graft to develop ulcerations, blisters, callouses and continuing pain in the foot. We find that the evidence is not extensive nor are the expenses itemized; however, we believe that there was sufficient evidence to take the matter to the jury.
In Albin v. Munsell, 189 Kan. 304, 312, 369 P.2d 323 (1962), we made the following statement in response to a very similar challenge to a jury instruction:
"Turning again to Instruction No. 15 appellants point to the last three paragraphs, above emphasized, of such instruction and insist that the three specific items therein mentioned should not have been included in the instruction because there was no evidence from which the jury could reasonably draw any conclusion as to the amounts to be allowed appellee for prospective future medical expenses; for mental anguish resulting from mutilation or disfigurement; and for permanent disability or loss of future earning capacity resulting from his injuries. We are not disposed to burden this opinion with the pertinent evidence of record or labor the contentions advanced by appellants as to its sufficiency. It suffices to say that, *414 after reviewing the entire record and giving consideration to all contentions advanced, we have no difficulty in concluding the evidence in this case clearly warrants the trial court's action in giving the portions of the instruction now in question, and that contentions advanced by them to the contrary are devoid of merit and cannot be upheld. The fact that the damages disclosed by the evidence cannot be calculated with absolute mathematical or financial exactness does not render them so uncertain as to preclude their assessment. (See, e.g., Domann v. Pence, 183 Kan. 135, 141, 325 P.2d 321; Avery v. City of Lyons, 183 Kan. 611, 621, 331 P.2d 906; Rupp v. Norton Coca-Cola Bottling Co., 187 Kan. 390, 392, 393, 357 P.2d 802; Connell v. Norton Coca-Cola Bottling Co., 187 Kan. 393, 397, 357 P.2d 804; Baisdrenghien v. Railway Co., 91 Kan. 730, 139 Pac. 428; Railway Co. v. Fowler, 61 Kan. 320, 329, 59 Pac. 648.)"
In view of the evidence reviewed above, we find no error.
5. The Santa Fe contends that the trial court erred in failing to give the second paragraph of PIK Civ.2d 16.09 (1977). The trial court gave, as its instruction No. 9, the following instruction which is the first paragraph of the PIK instruction:
"Reference has been made in this case to certain rules adopted by the railroad for the safety of its employees. These rules were not admitted into evidence as legal standards of duty, but as evidence of the degree of reasonable care to be exercised on the part of either the plaintiff or the defendant in situations to which the rules apply."
The railroad complains that the trial court omitted the following portion of the PIK instruction:
"When a rule has been customarily violated, with the knowledge of those whose duty it was to enforce the rules or to report their violations, the rule may be regarded as inoperative."
In support of this claim, the Santa Fe contends that its evidence showed that Operating Rule 120, which requires that cars must be left with sufficient hand brakes to prevent movement, was habitually violated in the Topeka switching yards. Therefore, it contends that the rule was inoperative and the failure of the north crew to apply hand brakes on the three cars plaintiff attempted to board and brake should not be charged as negligence on the part of the railroad. The difficulty with this argument is that the evidence was hotly disputed, and there was evidence that the trainmaster attempted to enforce this rule; that the rule had not been habitually violated, but in fact was rather strictly enforced. This instruction was not one of those included in the railroad's requested instructions and thus was not one of those which it deemed of major import to present its side of the dispute. Violations of Rule 120 was not the only ground of negligence relied *415 upon by the plaintiff; one of the grounds upon which he relied was the failure of the railroad to enforce its own safety rules. Under all of the circumstances, and upon the record before us, we conclude that the trial court's instructions properly presented the issue to the jury, that the matter of the enforcement or nonenforcement of the rules was adequately presented in the evidence, and that substantial justice was done.
6. Next, the railroad contends that the trial court erred in refusing one of its requested instructions which would have informed the jury that the railroad is not an insurer or guarantor of its employees' safety. It contends that this instruction was necessary in order that the jury be aware that liability could only be founded upon a failure of the railroad to use ordinary care  in short, upon the railroad's negligence.
The trial court instructed the jury in the wording of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., stating that the railroad "shall be liable in damages ... [for] injury ... resulting in whole or in part from [its] negligence." Plaintiff's claim that the railroad was negligent was thoroughly and specifically set forth. Finally, negligence was properly and adequately defined for the jury. We conclude that the substance of the instruction was included within the instructions given and that the trial court's instructions adequately explained to the jury the basis upon which the defendant could be held liable. The refusal of a trial court to give requested instructions does not result in reversible error when the substance thereof is contained in the instructions given. See Kleibrink v. Missouri-Kansas-Texas Railroad Co., 224 Kan. 437, 442, 581 P.2d 372 (1978), and cases there cited.
7. The appellant contends that the trial court erred in refusing to give a suggested instruction on foreseeability. Foreseeability of injury is an element of negligence in FELA cases. See Louisville and Nashville Railroad Company v. Dollar, 294 Ala. 276, 314 So.2d 867 (1975). Here, as in the Dollar case, however, the trial court properly defined negligence without the specific use of the word "foreseeability." As in the point last discussed above, the trial court did not err in refusing to give the requested instruction when the substance thereof was contained in the instructions given.
8. Was the award of $529,200 unreasonable, excessive and *416 punitive? That difficult question is the next point raised by the appellant. In Riggs v. Missouri-Kansas-Texas Rld. Co., 211 Kan. 795, 508 P.2d 850 (1973), we stated the standard for determining whether a verdict in an FELA case was excessive. We said:
"The railroad argues that the verdict ... is so excessive as to require a reversal or a remittitur of the excessive amount. We have held on many occasions that there is no fixed or absolute standard for measuring the excessiveness or inadequacy of a verdict in a personal injury action. The question must be decided on the particular facts of the individual case and whether injury proximately resulted from the negligence of a party, and the extent of any such injury, are ordinarily matters for the jury to determine. (Brown v. Godfrey, 200 Kan. 568, 438 P.2d 117.) In order for a judgment to be set aside on the grounds of an excessive verdict, it must appear that the amount of the verdict is so grossly excessive as to shock the conscience of the court. (Spencer v. Eby Construction Co., 186 Kan. 345, 350 P.2d 18.)" (Emphasis supplied.) 211 Kan. at 802.
We shall not attempt to set out in this opinion all of the facts upon which the Santa Fe relies as showing that the award was excessive. Suffice it to say that the plaintiff, after about two months in the hospital and more than a year of recovery at home, was able to return to full-time work. He is now performing a job substantially similar to the work he was performing when injured, but he spends less time on his feet. He is working full time, earning more than he was before the injury. He still experiences pain in his feet, has difficulty on rough terrain, requires special footwear, and blisters easily on the grafted skin. He has not missed work due to his feet since returning. There was medical evidence indicating that he may have future difficulties, but the nature and extent of those difficulties are unpredictable. It does not appear that plaintiff is presently disabled to any significant extent because of the accident. One physician estimated a 30%-35% permanent impairment of the left foot; the other estimated a 20%-25% permanent partial disability to the body as a whole. The latter believed that if plaintiff continues to perform the work he was doing, he would have worsening problems with his feet.
Plaintiff, on the other hand, points to the intangible nature of pain and suffering and the permanent partial disability which he suffers because of the injury. There was evidence that plaintiff suffered constant and intense pain during the first few months after the accident. There is no hard and fast rule for measuring, in dollars, the amount to be awarded for intangible losses like pain and suffering. An appellate court must observe a certain restraint *417 when approaching claims of excessive verdicts. In Domann v. Pence, 183 Kan. 135, 141, 325 P.2d 321 (1958), this court said:
"As was said and held in Knoche v. Meyer Sanitary Milk Co., 177 Kan. 423, 280 P.2d 605, there is of course no uniformity in our decisions on the proposition of when damages allowed in a personal injury action are excessive for the simple reason determination of the question necessarily depends upon the facts and circumstances of each particular case as it is presented for review. To like effect is Smith v. Wichita Transportation Corp., 179 Kan. 8, 293 P.2d 242. No verdict is right which more than compensates  and none is right which fails to compensate. (Union Pac. Ry. Co. v. Milliken, 8 Kan. 647, 655.) Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence."
The question resolves itself down to a determination of whether or not the verdict shocks the conscience of the court. The trial court in this case heard the evidence, approved the verdict, and denied a motion for a remittitur. The consideration of awards in other cases is of little help. Defendant points to a number of cases involving similar and more compelling facts, where the awards were much less. See Annot., Damages  Injuries to Legs and Feet, 13 A.L.R.4th 212, § 11 (1982). The plaintiff, on the other hand, summarizes recent jury verdicts and settlements in other cases to show that the verdict in this case is consistent with other cases of similar nature. Those cases are summarized in volumes 22 to 25, inclusive, ATLA Law Reporter. We have carefully reviewed the evidence in this case, particularly that relating to the issue of pain and suffering, the medical treatment necessitated by the injury, and the medical prognosis. Under the evidence before us in this record, we hold that the award, though substantial, is not excessive.
9. Finally, appellant complains of various comments and arguments made by plaintiff's counsel during this lengthy trial and contends that such comments and arguments were prejudicial to the appellant and require the reversal of this judgment. We have carefully reviewed the record targeted by appellant. This case was well and ably tried by most conscientious and capable counsel on both sides of the table. We will not detail each *418 instance specified as error; suffice it to say that we have examined them all and find that either they were cured by prompt rulings of the trial court or they were insufficient to result in substantial prejudice. We find no reversible error.
The judgment is affirmed.
McFARLAND, J., not participating.
SCHROEDER, C.J., dissenting:
On the evidence in this case awarding the plaintiff over one-half million dollars for his injuries is clearly excessive and shocks the conscience of reasonable persons. It should be specifically noted in considering the evidence in this case that this plaintiff was the area foreman of a switching crew. Time constraints prohibit an in-depth discussion of the evidence in this dissenting opinion.
The court in this case ignores the substance of the affidavits disclosing misconduct of the jury. The procedure used by the jury to arrive at the amount of its verdict in this case was to apply a formula which operated in absolute reverse to the concept of comparative negligence. First, the jury decided how much it wanted to give the plaintiff as damages for his injury without considering the comparative fault of the plaintiff. As a second step, to render a verdict which ostensibly complied with the court's instruction, the jury then calculated what the total verdict should be to give the plaintiff the net amount in damages it had previously determined.
This procedure, which the court approves in its opinion, will completely emasculate our comparative negligence statute.
It is respectfully submitted the judgment should be reversed and a new trial granted.