No. 97,132

RICHARD WILLIAMS, *Appellee/Cross-appellant*, v. DR. STEVE LAWTON, *Appellant/Cross-appellee*.

(207 P.3d 1027)

770

Opinion filed May 29, 2009.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, argued the cause, and *Amy S. Lemley* and *Brooke Bennett Aziere*, of the same firm, of Wichita, were with him on the briefs for appellant/cross-appellee.

*Lawrence W. Williamson, Jr.*, of Shores, Williamson, and Ohaebosim, LLC, of Wichita, argued the cause and was on the brief for appellee/cross-appellant.

*G. Andrew Marino* and *Shannon L. Holmberg*, of Gilliland & Hayes, P.A., of Wichita, and *Peter S. Johnston* and *Dustin J. Denning*, of Clark, Mize & Linville, Chartered, of Salina, were on separate briefs for *amicus curiae* Kansas Association of Defense Counsel.

The opinion of the court was delivered by

LUCKERT, J.: This interlocutory appeal follows a district judge's decision to grant a new medical malpractice trial because of jury misconduct. More specifically, the district judge found the defendant was prejudiced by the jury's agreement to average each juror's assessment of negligence and to accept the resulting quotient as the jury's verdict. Subsequently, the district judge certified three questions for interlocutory appeal: (1) Was it error to admit the testimony of the plaintiff's medical malpractice liability expert who had retired from clinical practice several months before the medical treatment that gave rise to this case? (2) Was it error to *sua sponte* recall the jury? and (3) Did the judge commit error by questioning the jurors without allowing the attorneys to directly participate in the questioning?

After accepting the interlocutory appeal, the Court of Appeals broadened the scope of the issues, finding defense counsel's conduct in interviewing the jurors to be inappropriate and determining that the issue of whether a new trial should be granted was inextricably intertwined with the interlocutory issues. Then, finding error in the procedure followed in recalling the jurors, in the district judge's questioning of the jurors, and in the district judge's decision that there had been a prejudicial quotient verdict, the Court of Appeals reversed the district court's grant of a new trial. *Williams v. Lawton*, 38 Kan. App. 2d 565, 170 P.3d 414 (2007).

Dr. Steve Lawton filed a petition for review, raising several issues relating to the Court of Appeals' jurisdiction and holdings. Upon our review, we conclude the Court of Appeals had jurisdiction over all the issues it considered, but we reverse the holding that the district judge erred in granting a new trial because the determination of whether there was a quotient verdict is inherently factual and substantial competent evidence supports the district judge's findings.

## District Court Proceedings

This medical malpractice action was filed after Richard Williams suffered complications from an adult circumcision performed by Lawton. A jury found Lawton 54 percent at fault for Williams' injuries and awarded $200,000 for past and present pain and suffering and $1.775 million for future pain and suffering.

Lawton subsequently filed several motions, including a motion for a cap on damages to be applied to the verdict pursuant to K.S.A. 60-19a02 and a motion for judgment as a matter of law (notwithstanding the verdict) or, in the alternative, a motion for new trial. See K.S.A. 60-250(b). Lawton's motion for a new trial was based on several issues, including two that are pertinent to this appeal. First, Lawton renewed pretrial and trial objections to the qualifications of Williams' standard-of-care expert witness, Philip Diggdon, M.D. Lawton argued that K.S.A. 60-3412 required Diggdon's disqualification because Diggdon had retired approximately 3 months before Lawton treated Williams. Because Diggdon's professional

time at the time of the incident was entirely devoted to legal consulting, Lawton argued the expert was disqualified.

Second, Lawton's motion for a new trial alleged juror misconduct, an argument he supported by the affidavit of a juror, Juror A.S., which defense counsel procured after conducting postverdict systematic telephone interviews of the jurors. The affidavit stated in part that "the verdict was reached by averaging all of the jurors' opinions."

After holding a hearing and considering the affidavit of Juror A.S. and the affidavits of two other jurors submitted by the plaintiff's counsel, the district judge issued an order requesting that all the jurors return for questioning. Eight of the 12 jurors appeared and separately testified in response to the judge's inquiries. The district judge conducted the questioning; the attorneys were not permitted to directly participate.

Based upon the jurors' responses, the district judge found, *inter alia*, there was juror misconduct by means of an improper quotient verdict and the misconduct "substantially prejudiced" Lawton's rights. Consequently, the district judge granted Lawton's motion for a new trial. Subsequently, the proceedings were stayed when the district judge granted the parties' request to seek an interlocutory appeal.

## Court of Appeals' Decision

The Court of Appeals granted Lawton's request for an interlocutory appeal and, by subsequent separate order, granted Williams' interlocutory cross-appeal.

### Scope of Interlocutory Appeal

From the start, the parties disagreed about the scope of issues in this appeal. In their appellate briefs, each party focused on the certified question or questions corresponding with their individual grievances. Lawton appealed the district judge's decision to admit Diggdon's expert testimony, and Williams questioned the procedures that led to the recall of the jury. Lawton argued, however, that Williams inappropriately attempted to broaden the Court of Appeals' scope of review by raising other issues related to the dis-

trict judge's order granting a new trial and seeking a reinstatement of the jury's verdict. Lawton asserted that the Court of Appeals' jurisdiction was limited to consideration of the three issues certified for interlocutory appeal by the district judge and, therefore, the district judge's order granting a new trial was neither appealed nor appealable.

The Court of Appeals, in a split decision, disagreed with Lawton's contention that the scope of the interlocutory appeal should be so limited and stated two reasons for its decision. First, the majority stated that if it were to address the specific certified questions related to jury recall without considering whether a new trial was warranted, any decision issued would be merely advisory, which is prohibited. 38 Kan. App. 2d at 570. As support for this reasoning, the majority noted that the district judge expected the Court of Appeals "to review the key questions of law and determine whether jury recall and its outcome adequately supported the order for a new trial." 38 Kan. App. 2d at 571. As the Court of Appeals majority observed, the district judge noted that only legal questions can be certified for interlocutory appeal and the question of whether there was a quotient verdict was factual but "that what goes up is the whole motion for new trial and not just whatever issue I say goes up." 38 Kan. App. 2d at 571.

Second, the Court of Appeals majority stated that each of the three certified questions "were derived from and were the lynchpins" for the district judge's order granting a new trial. 38 Kan. App. 2d at 572. The majority cited *Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, Syl. ¶ 2, 997 P.2d 681 (2000), where this court held that issues not meeting the criteria for an interlocutory appeal may be reviewed along with appealable issues where the issues are " 'inextricably intertwined' " and must be reviewed " 'to allow meaningful review and promote judicial economy.' " 38 Kan. App. 2d at 571.

Retired Justice, now Senior Judge Edward Larson, assigned to the Court of Appeals panel, concurred in part with and dissented in part from the majority opinion. 38 Kan. App. 2d at 586-97. As to the question of scope, Senior Judge Larson would have held that the district judge improperly certified the questions for interlocu-

tory appeal and that the Court of Appeals improvidently granted consideration of the same. 38 Kan. App. 2d at 586 (Larson, J., dissenting in part). Nevertheless, because the interlocutory appeal was accepted by the Court of Appeals, Senior Judge Larson concurred with the majority's view that the issues relating to jury recall and the granting of a new trial were inextricably intertwined and, thus, it was necessary to consider all issues pertaining to the district judge's order for a new trial. 38 Kan. App. 2d at 587-88 (Larson, J., concurring in part).

*Qualification of Plaintiff's Expert Witness*

Having determined there was no procedural bar to the consideration of the substantive issues, the Court of Appeals addressed the certified question which is the subject of Lawton's appeal: Did the district judge err in finding the plaintiff's sole expert witness, Diggdon, met the criteria set forth in K.S.A. 60-3412 and in rejecting the argument that the error was a basis for ordering a new trial? The majority, with Senior Judge Larson concurring, concluded that the record supported the district judge's finding that Diggdon spent at least 50 percent of his professional time during the 2 years preceding the incident in his actual clinical practice, regardless of the fact that he retired approximately 3 months before the incident and became a full-time consultant thereafter. 38 Kan. App. 2d at 574; 38 Kan. App. 2d at 588-89 (Larson, J., concurring in part). The Court of Appeals held that the district judge correctly interpreted and applied K.S.A. 60-3412, Diggdon properly testified on behalf of Williams, and the admission of Diggdon's expert testimony was not a basis for granting a new trial. 38 Kan. App. 2d at 575.

*Jury Recall and Questioning of Jurors*

Next, the Court of Appeals addressed Williams' interlocutory cross-appeal in which he challenged the district judge's decision to recall the jury, arguing that the recall did not follow a party's motion and was not timely. He also argued the trial judge erred in not allowing counsel to participate in the questioning of the recalled jurors and in asking jurors questions that invaded the mental proc-

esses of the jury. Finally, Williams argued Lawton had failed to show sufficient misconduct to warrant granting a new trial.

The Court of Appeals majority concluded that the district judge abused his discretion in granting a new trial and in implementing the procedures that led to the decision. 38 Kan. App. 2d at 581-84. As to defense counsel's postverdict systematic contact of the entire jury "with the clear intention of exploring grounds to impeach the verdict," the majority indicated it would be a "better practice" to undertake such action only with the knowledge and consent of the district judge. 38 Kan. App. 2d at 581.

Senior Judge Larson disagreed, finding nothing improper with the communications between counsel and the jurors. The dissent stated that requiring court approval would abandon long-time practice, severely limit attorneys in their "search for the truth and integrity of a jury's verdict, and make misconduct of a jury unduly difficult to be discovered and rectified." 38 Kan. App. 2d at 589 (Larson, J., dissenting in part).

The Court of Appeals majority further determined that the district judge violated Supreme Court Rule 181 (2008 Kan. Ct. R. Annot. 247), which prohibits jurors from being called for hearings on posttrial motions without a court order "after motion and hearing" to determine whether any jurors should be recalled. The majority held that Rule 181, if not expressly violated, was violated "in spirit." 38 Kan. App. 2d at 582. Senior Judge Larson, dissenting on this point, noted that the district judge stated he was addressing the matter *sua sponte* but defense counsel apparently viewed this as an invitation for a motion and promptly accommodated the judge with an oral motion. 38 Kan. App. 2d at 590 (Larson, J., dissenting in part).

On a related issue, the Court of Appeals majority concluded that although the district judge's personal questioning of jurors without the direct participation of counsel was not an abuse of discretion, the questions asked "may" have improperly invaded or probed the mental processes of the jurors. 38 Kan. App. 2d at 582. Again, Senior Judge Larson disagreed and would have found that the questions asked by the district judge related to the issues discussed and became specifically directed to whether the jurors had a prior

agreement to be bound by the average which was taken by the jury and became its verdict on the liability issue. The questions, according to the dissent, did not violate the limitations of K.S.A. 60-441 because they generally related to the action taken by the jury, not the jury's mental processes. 38 Kan. App. 2d at 590-94 (Larson, J., dissenting in part).

*Quotient Verdict*

The Court of Appeals next considered whether the jurors' testimony evidenced a quotient verdict. The majority concluded that "the collective testimony of the jurors did not support jury misconduct" and did not support a quotient verdict. 38 Kan. App. 2d at 583. The Court of Appeals' majority held the circumstances were insufficient to set aside the jury's verdict and to order a new trial. Thus, the Court of Appeals reversed the order granting a new trial and remanded with directions to reinstate the jury's verdict. 38 Kan. App. 2d at 585-86.

Senior Judge Larson, in his dissent, would have affirmed the district judge because there was sufficient evidence to support the district judge's finding of jury misconduct. Specifically, Senior Judge Larson pointed out that at least four of the eight jurors who appeared before the court for questioning indicated there was an advance agreement to average each juror's suggested verdict and to use the resulting quotient as the jury's verdict. 38 Kan. App. 2d at 595-97 (Larson, J., dissenting in part).

## Analysis

### 1. Jurisdiction

We will first discuss Lawton's argument that the Court of Appeals lacked jurisdiction over any issue other than the question of Diggdon's qualifications. Specifically, Lawton raises three issues relating to jurisdiction. First, Lawton asks us to agree with Senior Judge Larson's view that the Court of Appeals should not have granted Williams' request for interlocutory appeal. Second, Lawton contends the issues raised by Williams—*i.e.*, those related to the granting of a new trial—were not timely brought before the Court of Appeals because Williams did not submit his application for

interlocutory appeal within 10 days of the district judge's order as required by K.S.A. 2008 Supp. 60-2102(c). Third, even if Williams' assertions were not time-barred, Lawton presents an alternative argument that the Court of Appeals exceeded its authority by addressing issues regarding the order granting a new trial. Lawton ·asserts that appellate jurisdiction should have been limited to the three questions certified by the district judge.

Each of these issues is premised upon a question of whether the Court of Appeals and, in turn, this court have jurisdiction to review the issues. It is well established that appellate jurisdiction is defined by statute; the right to appeal is neither a vested nor constitutional right. The only reference to appellate jurisdiction in the Kansas Constitution iterates this principle, stating the Kansas Supreme Court shall have "such appellate jurisdiction as may be provided by law." Kan. Const., art. 3, § 3; *Flores Rentals v. Flores*, 283 Kan. 476, 480-81, 153 P.3d 523 (2007). The constitution is silent regarding the Court of Appeals, which is not a constitutional court but rather was statutorily created. In creating the Court of Appeals, the legislature limited the court's jurisdiction, defining the circumstances under which there is jurisdiction to hear an appeal. As a result, Kansas appellate courts may exercise jurisdiction only under circumstances allowed by statute; the appellate courts do not have discretionary power to entertain appeals from all district court orders. *Flores Rentals*, 283 Kan. at 481; see *Meddles v. Western Power Div. of Central Tel. & Utilities Corp.*, 219 Kan. 331, 333, 548 P.2d 476 (1976); *Henderson v. Hassur*, 1 Kan. App. 2d 103, 105-06, 562 P.2d 108 (1977).

The question of whether an appellate court has jurisdiction is a question of law over which the scope of review is unlimited. *Cypress Media*, 268 Kan. at 414; *Vorhees v. Baltazar*, 283 Kan. 389, 397, 153 P.3d 1227 (2007). If an appellate court does not have jurisdiction, it has a duty to dismiss an appeal. *Flores Rentals*, 283 Kan. at 480; *Max Rieke & Brothers, Inc. v. Van Deurzen & Assocs.*, 34 Kan. App. 2d 340, 342-43, 118 P.3d 704 (2005).

*a. Timeliness*

Lawton asserts Williams' initial application for an interlocutory appeal—raising, *inter alia*, the two certified questions regarding jury recall—was untimely under the 10-day filing requirement of K.S.A. 2008 Supp. 60-2102(c) and, therefore, the issues raised by Williams should not have been considered by the Court of Appeals. Although this issue was not discussed in the Court of Appeals' opinion, appellate jurisdiction is a question that may be raised at any time, whether for the first time on appeal or even on the appellate court's own motion. *Vorhees*, 283 Kan. at 397. Consequently, we consider the issue.

Williams concedes that his application was not filed within 10 days of the order that certified the questions for interlocutory appeal. Nevertheless, he argues the application was timely because it was filed within 10 business days plus 3 days for mailing.

In fact, Williams' application was filed 17 days after the August 5, 2006, order which allowed the interlocutory appeal. However, under K.S.A. 2008 Supp. 60-206(a), intermediate Saturdays, Sundays, and legal holidays are excluded in the computation of any time period less than 11 days. August 5, 2006, was a Friday. When intervening Saturdays and Sundays are excluded from the counting, the 10th day was Friday, August 18, 2006, but Williams did not file his application for interlocutory appeal with the Clerk of the Appellate Courts until August 21, 2006. Hence, if a 3-day mailing period is not applicable, Williams' application is untimely.

The 3-day mailing rule is stated in K.S.A. 2008 Supp. 60-206(d):

"Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon such party and the notice or paper is served upon such party by mail, three days shall be added to the prescribed period."

According to Lawton, this provision does not extend Williams' time to file his application for interlocutory appeal because the plain language of K.S.A. 2008 Supp. 60-2102(c) controls and it makes no mention of service. Rather, K.S.A. 2008 Supp. 60-2102(c) specifies the application for interlocutory appeal must be filed "within 10 days after the entry of the order" allowing an interloc-

utory for appeal. Supreme Court Rule 4.01 (2008 Kan. Ct. R. Annot. 30) also provides that when an appeal is sought under the provisions of K.S.A. 2008 Supp. 60-2102(c), an application for permission to take such an appeal shall be served within 10 days "after the filing of the order from which an appeal is sought to be taken."

Based solely upon the language of these provisions, Lawton's argument seems sound. Nevertheless, the persuasiveness is diluted by analogous authority in which this court has applied the 3-day mailing rule even though the triggering provision did not mention service. In such cases, this court has reasoned that other statutes and rules require judges to serve orders on the parties to the litigation. See *Danes v. St. David's Episcopal Church*, 242 Kan. 822, 824-27, 752 P.2d 653 (1988).

In *Danes*, the specific question was whether the appellant had timely filed postverdict motions; the triggering action was the entry—not service—of judgment. Nevertheless, the court noted that K.S.A. 60-258 requires the clerk of the court to " 'serve a copy of the judgment form on all attorneys of record within three days.' " 242 Kan. at 824. Similarly, but with broader application, Supreme Court Rule 134 (2008 Kan. Ct. R. Annot. 217) provides:

"Whenever a judge shall make a ruling on a motion or application of any kind and there are parties affected who have appeared in the action but who are not then present, either in person or by their attorneys, the judge shall cause written notice of such ruling to be sent to the parties or attorneys forthwith."

In light of these provisions, the court held that "where notice of the entry of judgment is mailed in compliance with K.S.A. 60-258 and Rule 134, the time for filing postjudgment motions or taking an appeal starts to run when the notice is mailed, and the three-day extension as provided in K.S.A. 60-206(e) applies." 242 Kan. at 827.

This holding from *Danes* is not directly applicable, however, because the entry of an order certifying questions for interlocutory appeal—which is the order triggering the running of the 10 days in this case—is not a judgment and K.S.A. 60-258 does not apply. Nevertheless, Rule 134, which applies to all rulings made by a judge, does. A failure to apply that rule would result in traps for

the unwary, having the 3-day rule apply in some cases and not in others.

Here, although the district judge orally advised the parties of his decision to allow the interlocutory appeal during the telephone conference, the ruling was documented several days later in an order which included specific findings. The entry of this order triggered the judge's duty to "cause written notice of such ruling to be sent" (Rule 134), and also triggered the time in which the parties had to file an application for interlocutory appeal. Hence, the effect of Rule 134 is that the 3-day mailing rule of K.S.A. 2008 Supp. 60-206(d) extends the 10-day period for filing an application for interlocutory appeal under K.S.A. 2008 Supp. 60-2102(c). Applying the 3-day mailing rule in this case, Williams' application for an interlocutory cross-appeal was timely.

*b. Appropriateness of Interlocutory Appeal*

Lawton also argues the Court of Appeals erred in granting an interlocutory appeal. In arguing the issue, Lawton relies primarily on points made by Senior Judge Larson in his dissent. He opined that the Court of Appeals should have held that the district judge improperly certified the questions for interlocutory appeal, should have denied permission for consideration of the interlocutory appeal and cross-appeal, and should have held that such permission was improvidently granted. *Williams*, 38 Kan. App. 2d at 586 (Larson, J., dissenting in part); see *City of Manhattan v. Eriksen*, 204 Kan. 150, 155, 460 P.2d 622 (1969) (finding permission to take an interlocutory appeal was improvidently granted).

K.S.A. 2008 Supp. 60-2102(c) defines when an interlocutory appeal may be taken and provides:

"When a district judge, in making in a civil action an order not otherwise appealable under this section, is of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the judge shall so state in writing in such order. The court of appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within 10 days after the entry of the order under such terms and conditions as the supreme court fixes by rule."

In clear terms, K.S.A. 2008 Supp. 60-2102(c) gives the Court of Appeals discretion to grant an interlocutory appeal but limits that discretion by stating criteria which must be met before an interlocutory appeal may be properly allowed by the district court and accepted by the Court of Appeals. See *State v. Brown*, 285 Kan. 261, 294, 173 P.3d 612 (2007) (discretion is abused if applicable law is not considered and applied). Under 60-2102(c), the interlocutory appeal must: (1) involve a controlling question of law, (2) relate to an issue on which there is a substantial ground for difference of opinion, (3) materially advance the ultimate termination of the litigation, and (4) be timely filed.

Lawton argues that the determinative issue decided by the Court of Appeals—whether there was an improper quotient verdict justifying a new trial—is a question of fact and, further, that none of the issues will materially advance the termination of the litigation. Lawton points out that several issues were still pending in the district court, including the constitutionality of the caps on damages imposed by K.S.A. 60-19a02. Because a further appeal seems likely, the dissent viewed the interlocutory appeal as serving only to delay the litigation and cause piecemeal consideration of the issues. 38 Kan. App. 2d at 586-87 (Larson, J., dissenting in part).

Lawton and Senior Judge Larson in the dissent make several valid points regarding whether this interlocutory appeal advances the litigation, and generally we do not favor interlocutory appeals of motions for a new trial. See *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 485-86, 15 P.3d 338 (2000). Nevertheless, because our standard of review is abuse of discretion, we cannot say the Court of Appeals erred in accepting the interlocutory appeal, especially in light of the fact that one issue—the question of Dr. Diggdon's qualifications—meets the criteria for an interlocutory appeal. First, the determination of Diggdon's qualifications is a question of law because the facts are not disputed and resolution of the issue hinges on the interpretation of K.S.A. 60-3412. See *In re Adoption of A.A.T.*, 287 Kan. 590, 627, 196 P.3d 1180 (2008) (statutory interpretation is a question of law). Second, there is substantial room for disagreement on the issue. Third, resolution of the issue has the potential of terminating the litigation because, if

Diggdon is not qualified and his testimony cannot be properly admitted, Williams did not meet his burden of establishing a deviation from the standard of care and the defense motion for judgment as a matter of law (notwithstanding the verdict) should be granted. See *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008) (plaintiff in medical malpractice case must show deviation from standard of care and that deviation caused plaintiff's injuries; ordinarily expert testimony is required to meet this burden). Fourth, the timeliness of Lawton's interlocutory appeal of this issue has not been questioned. Consequently, it was an appropriate exercise of discretion to accept the interlocutory appeal on this issue.

Having accepted the question of the expert's qualifications, we cannot say the Court of Appeals abused its discretion in accepting the other questions and allowing the interlocutory appeal. The only reason to accept interlocutory jurisdiction of the issue regarding the expert witness' qualifications is to determine if the evidence should be admitted during a new trial, and the other certified questions—those raised by Williams—get to the heart of the question of whether there should be a new trial. This interrelationship of issues relates to Lawton's next argument regarding whether the Court of Appeals had pendent jurisdiction to consider the issues relating to the new trial.

### c. Limited Jurisdiction on Interlocutory Appeal

The pendent jurisdiction question arises from Lawton's argument that the Court of Appeals exceeded its authority by considering the district judge's order granting a new trial. If Lawton is correct, appellate jurisdiction should have been limited to the questions certified by the district judge—Diggdon's qualifications, the district judge's decision to recall the jury, and the judge's questioning of the jurors—and none of these questions raises the issue of whether a new trial should have been granted. Yet, the Court of Appeals considered that question.

In response, Williams essentially argues that the Court of Appeals—and this court—acquired pendent interlocutory jurisdiction to hear all issues related to the district judge's order granting a new

trial because the issues were inextricably intertwined with the three questions certified for interlocutory appeal.

The principle of pendent jurisdiction, also known as supplemental jurisdiction, typically involves a federal court's exercise of jurisdiction over state law claims brought within the same controversy. *Rodriguez-Tocker v. Estate of Tocker*, 35 Kan. App. 2d 15, 25-26, 129 P.3d 586 (2006); see *In re Aramark Leisure Services*, 523 F.3d 1169, 1175 (10th Cir. 2008) (supplemental jurisdiction under 28 U.S.C. § 1367 [2006]); *Paper, Allied, Chemical v. Slurry Explosive Corp.*, 107 F. Supp. 2d 1311, 1327 (D. Kan. 2000) (same). Nevertheless, federal courts and some states have applied the underlying concept in determining the permissible scope of an interlocutory appeal. The resulting conclusion has been that the appeal is not necessarily limited to the precise questions that may have been certified by the district court and an appellate court may have supplemental interlocutory jurisdiction. See, *e.g.*, *Paper, Allied-Industrial v. Continental Carbon*, 428 F.3d 1285, 1291 (10th Cir. 2005) (interlocutory appeals originate from district court's order itself; appellate court can and should address different legal question if it controls disposition of certified order); *McFarlin v. Conseco Services, LLC*, 381 F.3d 1251, 1255 (11th Cir. 2004) (under statute governing interlocutory review, scope of appellate review is not limited to precise question certified by district court because court's order, not certified question, is brought before appellate court); *Kronemeyer v. U.S. Bank National Ass'n*, 368 Ill. App. 3d 224, 226-27, 857 N.E.2d 686 (2006) (where appealable issues are intertwined with nonappealable issues, appellate court may go beyond certified question and consider appropriateness of order giving rise to interlocutory appeal); *Armijo v. Wal-Mart Stores, Inc.*, 142 N.M. 557, 564, 168 P.3d 129 (Ct. App. 2007) (on interlocutory appeal, appellate court's scope of review may extend beyond question posed); but see *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 914 (Tenn. App. 2000) (for interlocutory appeals, only issues certified in trial court's order granting permission to seek interlocutory appeal and in appellate court's order granting interlocutory appeal can be raised).

Although there is little Kansas case law considering this concept, pendent or supplemental interlocutory jurisdiction was found to exist in *Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, 997 P.2d 681 (2002). In *Cypress Media*, this court recognized that in most circumstances an appellate court's task in an interlocutory appeal is to answer certified questions rather than to rule on the propriety of all underlying orders made by the district court. 268 Kan. at 414; see *Adams v. St. Francis Regional Med. Center*, 264 Kan. 144, 151, 955 P.2d 1169 (1998) ("The purpose of an interlocutory appeal is to resolve a 'controlling question of law' that would materially expedite a final determination in the case."). Nevertheless, an exception was recognized that applies where a certified issue in an interlocutory appeal is "inextricably intertwined" with other issues that do not meet the criteria for an interlocutory appeal. Under the exception, the other issues may also be reviewed to allow meaningful review and promote judicial economy. *Cypress Media*, 268 Kan. 407, Syl. ¶ 2.

In *Cypress Media*, the district court had issued an order compelling the defendant to give the plaintiff unredacted copies of attorney fee billing statements due to the defendant's failure to provide an adequate privilege log. The district court certified its ruling for interlocutory appeal, and the Court of Appeals granted the defendant's application for an interlocutory appeal before transferring the case to this court. The defendant argued that this court also had jurisdiction to consider the district court's prior ruling that the billing statements were not per se privileged, even though the district court had refused to certify that ruling for interlocutory appeal. According to the defendant, the privilege issue was "inextricably intertwined" with the district court's order to compel production, as that order was a reaction to the defendant's continued claim that the billing records were privileged. The *Cypress Media* court agreed, explaining that "the broader per se privilege issue was at the heart of and inextricably intertwined with the privilege log issue which has the effect of resolving the ultimate issue in this case." 268 Kan. at 415.

Here, the Court of Appeals majority concluded the issues were *so* intertwined with the certified questions that addressing the spe-

cific certified questions regarding jury recall without considering whether a new trial was warranted would require the issuance of an advisory opinion, which is prohibited. *Williams*, 38 Kan. App. 2d at 570; see *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 885, 179 P.3d 366 (2008) ("[T]he giving of advisory opinions is an executive, not a judicial, power."); *Smith v. Martens*, 279 Kan. 242, Syl. ¶ 1, 106 P.3d 28 (2005) ("The general rule is that an appellate court does not decide moot questions or render advisory opinions."). The district judge apparently struggled with this question of scope when deciding what questions to certify for interlocutory appeal, recognizing the determination there had been a quotient verdict justifying a new trial was the penultimate issue but concluding that "the quotient verdict issue is a mixed issue of law and fact. . . . [I]t is not something for which I can make the interlocutory findings."

In his concurring and dissenting opinion, Senior Judge Larson noted this statement and agreed, recognizing the mixed character of the question was a reason the Court of Appeals should not have granted the interlocutory appeal. 38 Kan. App. 2d at 588 (Larson, J., dissenting in part). Regardless, albeit with reluctance, Senior Judge Larson—who authored the court's decision in *Cypress Media*—agreed that "[i]t is logical that when the issue of the expert witness testimony under K.S.A. 60-3412 was certified for an interlocutory appeal, the authority for jury recall and the questioning of the jurors became inextricably intertwined with the additional issue of whether a new trial should have been granted." 38 Kan. App. 2d at 588 (Larson, J., concurring in part). Consequently, pursuant to this court's ruling in *Cypress Media*, 268 Kan. 407, Syl. ¶ 2, Senior Judge Larson concurred that it was proper to consider all the issues pertaining to the district judge's expert witness ruling and the order granting a new trial. *Williams*, 38 Kan. App. 2d at 588-89 (Larson, J., concurring in part).

We agree. The certified questions—which are questions of law—are inextricably intertwined with the question of whether the order for new trial was properly granted. A determination that there was error in allowing Diggdon's testimony would be meaningless if there was no right to a new trial, and there would be no

right to a new trial if the district judge erred in recalling the jurors, in questioning the jurors, or in finding jury misconduct. In other words, why correct evidentiary or procedural errors if a new trial would not be justified? The answers would be academic, and a remand would not be warranted. Thus, in order for there to be a meaningful review, it is necessary to consider whether there was a quotient verdict that justified a new trial and whether correct procedures were followed in reaching that decision. Consideration of all these issues also promotes judicial economy. Thus, the Court of Appeals correctly exercised its pendent or supplemental interlocutory jurisdiction.

## 2. Recall of Jurors

The next several issues relate to Lawton's contention that, under the circumstances, the district judge did not abuse its discretion in ordering a recall of the jury. He argues that postverdict juror interviews by defense counsel or counsel's representative, as in this case, are approved by Supreme Court Rule 169 (2008 Kan. Ct. R. Annot. 240) and that the recall of jurors was permissible and warranted, subject to Supreme Court Rule 181 (2008 Kan. Ct. R. Annot. 247).

The Court of Appeals majority disagreed, concluding an abuse of discretion was "inherent" in the district judge's rulings because: (a) "[s]ystematic juror by juror contact by counsel should not be undertaken without consent of court," (b) "[s]ua sponte recall is contrary to . . . Rule 181," and (c) the recall was "based solely on [Juror A.S.'s] affidavit" which was uncorroborated. 38 Kan. App. 2d at 581-82. With regard to the affidavit of Juror A.S., the Court of Appeals majority stated the district judge should have first called Juror A.S. to testify in person for further "corroboration" before ordering a recall of the entire jury. 38 Kan. App. 2d at 582.

Lawton contends that the Court of Appeals' ruling "utterly chills the exercise of rights under Rules 169 and 181" and that, in so ruling, the majority misinterpreted the two cases upon which it relied, *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987), and *State v. McDonald*, 222 Kan. 494, 496-97, 565 P.2d 267 (1977). He also argues that there is no

legal support for the Court of Appeals' requirement that a recall must first be restricted to the single juror who averred there was jury misconduct.

*Standard of Review*

Recalling jurors to answer for misconduct is within the sound discretion of the district judge. *State v. Kirkpatrick*, 286 Kan. 329, 351, 184 P.3d 247 (2008); *State v. Jenkins*, 269 Kan. 334, 338, 2 P.3d 769 (2000); *State v. Macomber*, 244 Kan. 396, 407, 769 P.2d 621, *cert. denied* 493 U.S. 842 (1989), *overruled on other grounds State v. Rinck*, 260 Kan. 634, 923 P.2d 67 (1996); see K.S.A. 60-259. We recently discussed jury recall in *Kirkpatrick*:

" 'Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order.' [Citation omitted.]" 286 Kan. at 351 (quoting *Ruebke*, 240 Kan. at 513).

*Additional Facts*

Here, upon discharge from jury duty, the district judge released the jurors from their admonitions and, consistent with Rule 169, instructed:

"You have now completed your duties as jurors in this case and are discharged with the thanks of the court. The question may arise whether you may discuss this case with the lawyers who presented it to you. For your guidance the court instructs you that whether you talk to anyone is entirely your own decision. *It is proper for the attorneys to discuss the case with you and you may talk with them,* but you need not. If you talk to them you may tell them as much or as little as you like about your deliberations or the facts that influenced your decision. If an attorney persists in discussing the case over your objections, or becomes critical of your service either before or after any discussion has begun, please report it to me." (Emphasis added.) 2008 Kan. Ct. R. Annot. 241.

Rule 169 mandates the giving of the substance, if not the letter, of this instruction upon completion of a jury trial.

Subsequent to the trial, defense counsel's legal assistant, consistent with defense counsel's usual postverdict practice, telephoned jurors. Some jurors could be reached and some could not. During the conversation with Juror A.S., the juror volunteered that the jury foreperson had persuaded the other members of the jury that it was not 10 members of the jury who had to agree on a verdict but *an average* of all 12 jurors' opinions. According to Juror A.S., the jurors agreed on this method of reaching the verdict. The jury foreperson tallied the average. Juror A.S. agreed to provide an affidavit, which stated in part:

"3. None of the jurors wanted to read the jury instructions. [The jury foreperson] stated that it was not 10 members of the jury who had to agree on the verdict, but that an average of all 12 jurors' opinions would be taken to reach the verdict. The other jurors agreed on this method of reaching a verdict. The verdict was reached by averaging all of the jurors' opinions.

"4. Instead of following the judge's instructions on how to tabulate the plaintiff's damages, the jurors kept wanting to discuss how much money the plaintiff needed. [The jury foreperson and another juror] . . . urged that the plaintiff was no longer insurable and the jury needed to make up for his not having insurance. . . .

. . . .

"6. The jury discussed the fact that their award should include money to cover the plaintiff's attorney's expenses. . . .

"7. In my opinion, Dr. Lawton did not get a fair trial from the jury. No one wanted to take the necessary time to review the evidence and reach a verdict. The jurors decided . . . to average all of their opinions to reach a verdict. . . . Despite my efforts to get the other jurors to review the jury instructions, consider the evidence that was relevant to the plaintiff's damages and discuss the issues until we could all agree on the verdict, I was unsuccessful and the verdict was reached through unfair means."

Lawton filed the affidavit to support his renewed motion for judgment as a matter of law and, in the alternative, motion for new trial. See K.S.A. 60-250(b); K.S.A. 60-259(d) (motion for new trial may be initiated and supported by presentation of affidavits). He argued the affidavit supported two grounds which justified the new trial: (1) The jury rendered an improper quotient verdict and (2) the jury failed to follow the district judge's instructions when calculating its damages award.

Williams responded by filing a motion in opposition to Lawton's motion and attached the affidavits of two other jurors, Juror B.B.

and Juror C.D., the jury foreperson. Juror B.B.'s affidavit indicated that "everyone got a chance to say whether they agreed or disagreed on each point that the jury sheet instructed us to consider" and that they agreed on the liability verdict. Juror B.B.'s affidavit also stated that, with regard to the amount of damages, "we went around the table and each juror gave an amount." There was no mention of averaging.

In addition, Juror B.B.'s affidavit stated: "One juror mentioned that Mr. Williams wouldn't be eligible for insurance; however, another juror quickly pointed out that the lack of insurance was not a part of the case. Thus, we did not consider insurance . . . . Furthermore, we *never* discussed attorney fees."

Juror C.D.'s affidavit indicated that the jurors agreed to take turns giving their opinions on the matters to be considered. The affidavit suggested that after all the jurors "came to the conclusion that there was a degree of fault by Dr. Lawton," each juror was supposed to write down a percentage to "see where we were." Juror C.D.'s affidavit also stated that the jurors "followed the jury instructions." There was no mention of averaging.

After conducting a motions hearing and considering the three affidavits submitted by counsel, the district judge stated he was considering recalling the jury *sua sponte*. Defense counsel then orally moved to recall the jury and, after hearing arguments of both counsel, the judge ordered the recall. By letter from the court, all the jurors were requested, but not ordered, to return to provide evidence. Eight of the jurors appeared and gave testimony.

### a. Defense Counsel's Interviews of Jurors

In discussing the procedure that was followed, the Court of Appeals majority disapproved of defense counsel conducting postverdict juror interviews without prior approval from the district court, stating: "We are most offended by the systematic contact of jurors after the verdict in an attempt to impugn the integrity of the verdict," and "[w]hen the verdict is not itself inherently suspicious and there is no misconduct reported by jurors, counsel must not invade the sanctity of the jury process in the hope of discovering such

misconduct." *Williams v. Lawton,* 38 Kan. App. 2d 565, 584, 170 P.3d 417 (2007).

Lawton argues this view is directly contradictory to the instruction the district judge gave the jury and, indirectly, counsel. In fact, the district judge emphasized that it had not ordered either side to refrain from contacting the jurors. The district judge further opined that "under Kansas law under those circumstances, as long as you're not harassing and as long as you followed my instructions with regard to the nature of the conduct and contact, attempting to contact any one of those 12 jurors was not improper."

In addition, Lawton argues the Court of Appeals' ruling is contrary to Rule 169, which was followed by the district judge in this case and, as previously quoted, specifically instructs that "[i]t is proper for the attorneys to discuss the case with you and you may talk with them, but you need not." 2008 Kan. Ct. R. Annot. 241.

The Court of Appeals majority recognized Rule 169 grants permission to have contact and an exchange between willing jurors and counsel. Yet, the majority went on to hold that "the better practice dictates that the systematic contact of the entire jury, juror by juror, with the clear intention of exploring grounds to impeach the verdict be undertaken only with the knowledge and consent of the court." 38 Kan. App. 2d at 581. In addition, the majority stated: "[W]here an affidavit results from such an effort without approval of the court, the affidavit should be viewed with a healthy amount of circumspection." 38 Kan. App. 2d at 581. To support these conclusions, the Court of Appeals majority relied on *McDonald,* 222 Kan. at 496-97, and *Ruebke,* 240 Kan. at 513.

In *McDonald,* after the trial, defense counsel learned of the existence of "exceedingly vituperative publications" that could have adversely prejudiced McDonald. 222 Kan. at 496. Based partially on this prejudicial pretrial publicity, defense counsel filed a motion for new trial. At the hearing on McDonald's motion, defense counsel stated that he had not interviewed the jurors because he thought he should first obtain the district court's consent and asked permission for both trial counsel to discuss the possible prejudicial pretrial publicity with the jurors. The district court denied the mo-

tion and further concluded that the publication had absolutely no effect on the trial.

On appeal, holding the district court erred, the *McDonald* court found that an inquiry into whether the jurors were aware of the inflammatory publication, read it, and discussed it was relevant and not proscribed by K.S.A. 60-441. 222 Kan. at 496. The *McDonald* court opined that the district court should have granted counsel leave to interview the jurors, stating:

"While there is nothing in our law to prohibit counsel from interviewing jurors after the conclusion of trial, leave of court is required before jurors may be called for hearings on posttrial motions. Supreme Court Rule No. 181 (220 Kan. LXVIII). We think counsel pursued a proper course in seeking permission of the court to interview jurors. When in doubt in an area such as this, counsel cannot be faulted for seeking guidance from the court." 222 Kan. at 497.

Hence, the court recognized the distinction between the requirements of Rule 181, which specifies that a jury cannot be recalled without a court order, and Rule 169, which states that attorneys may question jurors after the completion of a trial and jurors may answer. Permission of the court was not required before interviews could be conducted and, in fact, the *McDonald* court specifically stated that nothing prohibited counsel from making contact without permission, although the court did not fault counsel for seeking permission when in doubt. 222 Kan. at 497.

Similarly, *Ruebke* does not support the Court of Appeals' conclusion. In *Ruebke*, the district court refused to recall the jury to testify about allegations of juror misconduct brought by Ruebke. Upon review of the record on appeal, this court determined that the district court had permitted the interview of jurors both during and after the trial, but Ruebke had no valid evidence on which to base his motion for a new trial. Thus, this court held that the district court did not abuse its discretion by denying Ruebke's request to recall the jury in hopes of turning up some form of juror misconduct. 240 Kan. at 513-14. This holding—as recently reiterated in *Kirkpatrick*, 286 Kan. at 355—underscores that a jury should not be recalled unless necessary and for good cause shown. It does not, however, require—or even recommend—that counsel seek permission before interviewing willing jurors.

Further, other authorities are contrary to the Court of Appeals' view that permission of the court is required before counsel may conduct postverdict interviews with willing jurors. See, *e.g.*, *State v. Blocker*, 211 Kan. 185, 197, 505 P.2d 1099 (1973) (after verdict has been returned it is not improper for an interested attorney to interview members of jury so long as the limitations of applicable rule are observed); Kansas Rule of Professional Conduct (KRPC) 3.5(b) (2008 Kan. Ct. R. Annot. 543) ("A lawyer shall not: . . .[b] communicate . . . with a member of a jury . . . until after the discharge of the jury from further consideration of the case.").

These authorities express several policy considerations that are counter to the Court of Appeals majority's view. Many of these policies were summarized by Senior Judge Larson, who opined that imposing a court-approval requirement on postverdict communication between attorneys and jurors "would be an abandonment of long-time practice, severely limit counsel in their search for the truth and integrity of a jury's verdict, and make misconduct of a jury unduly difficult to be discovered and rectified." *Williams*, 38 Kan. App. 2d at 589 (Larson, J., dissenting in part). In addition, the Kansas Association of Defense Counsel, in its *amicus* brief, adds that postverdict communication with jurors assists attorneys in improving their trial technique and is a valuable educational tool.

These points are well taken. If jury conduct deprives any party of a fair trial, counsel should not be foreclosed from seeking evidentiary support for efforts to rectify the injustice. The Court of Appeals majority's approach would make it difficult, if not impossible, to ever present a factual basis suggesting improper conduct by a jury. Moreover, we have recognized the educational benefit of posttrial communication with jurors. This recognition occurred in the context of judicial education and was implicit in our amendment of Rule 169 to include a statement in the closing instruction to the jury that advises jurors they may receive a survey from the Kansas Commission on Judicial Performance and urges them to complete the survey. The same principle holds true for attorneys; feedback from jurors is an important self-education tool.

Nevertheless, as the Court of Appeals majority stressed, the judicial system is constructed on policies that value the finality of a

judgment. Hence, jury verdicts are not lightly set aside. In addition, the judicial system values the contributions of jurors and strives to protect them from criticism or harassment. See Concannon, *Impeaching Civil Verdicts: Juror Statements as Prejudicial Conduct*, 52 J.K.B.A. 201 (Fall 1983). Still, the ultimate goal of the judicial system is not to simply conclude a trial with a verdict. Rather, the goal is to achieve a fair and impartial verdict that is consistent with the court's instructions.

In our view, K.S.A. 60-441, K.S.A. 60-444, Rule 169, and Rule 181 strike an appropriate balance and protect these various interests. This balancing begins with Rule 169, which permits postverdict jury contact to the extent a juror wishes to communicate with an attorney. See Crystal, *Limitations on Zealous Representation in an Adversarial System*, 32 Wake Forest L. Rev. 671, 693 (1997) ("On balance, therefore, it seems proper for lawyers to be able to interview jurors after the case is over, so long as lawyers do not harass the jurors."); Diehm, *Impeachment of Jury Verdicts: Tanner v. United States and Beyond*, 65 St. John L. Rev. 389, 434 (1991) ("[I]f a party is precluded from interviewing jurors, the probability of that party's impeaching a verdict is substantially diminished. There is a danger that such limitations may prevent litigants from learning of egregious situations where the impeachment of the verdict is appropriate.").

Limits are imposed, however. Rule 169 itself makes clear that it is inappropriate to harass or criticize jurors. Additionally, under Rule 181, an attorney cannot seek to recall jurors without a motion and order of the court. Further, limits are imposed if the recall is allowed in that K.S.A. 60-441 and K.S.A. 60-444 define the limitations on the questions that may be asked of jurors. Therefore, the limitations imposed by the Court of Appeals majority are not necessary.

Consequently, we conclude the Court of Appeals majority overstepped clear precedent in narrowing the window of opportunity for postverdict communication between counsel and jurors. Under Supreme Court Rule 169, attorneys may discuss a trial with willing jurors after their discharge from jury duty and may do so without seeking permission from the district judge unless contrary orders

have been given. In this case, defense counsel and counsel's representative did not err by conducting telephone interviews of jurors after the trial.

### b. Supreme Court Rule 181

Williams next asserts that the district judge erred in ordering the jury recall *sua sponte*. As previously mentioned, the Court of Appeals majority concluded that the district judge violated Supreme Court Rule 181 (2008 Kan. Ct. R. Annot. 240), if not expressly, in "spirit." *Williams*, 38 Kan. App. 2d at 582. In seeking review of that conclusion, Lawton contends the district judge had the inherent authority to recall the jury on its own motion and further argues the district judge did not violate the rule.

Rule 181 provides:

"Jurors shall not be called for hearings on post-trial motions without an order of the court *after motion and hearing* held to determine whether all or any of the jurors should be called. If jurors are called, informal means other than subpoena should be utilized if possible." (Emphasis added.) 2008 Kan. Ct. R. Annot. 247.

In this case, at the posttrial motions hearing, the district judge pointed to the lack of a *specific* request for a recall, stating, "[G]iven the nature of the affidavits, neither side has requested recall. And the issue is whether either side is requesting recall. . . . I'm considering a *sua sponte* recall." The judge also explained, "I'm considering . . . whether as a matter of law I have to have a party request it or whether I can do it. I don't believe the rule says anything. It just says the Court may."

Focusing on this statement, the Court of Appeals majority referenced the Rule 181 requirement that jurors shall not be called for hearings on posttrial motions "without an order of the court *after motion and hearing*"(emphasis added) and concluded: "We believe this rule is intended to protect the integrity and finality of the verdict from precipitative action of the court." 38 Kan. App. 2d at 582.

The Court of Appeals' statement is correct to the extent Rule 181 requires a "motion and hearing" on the matter before a recall may be ordered. Nevertheless, in this case the district judge did not act until Lawton advanced allegations of jury misconduct in his

K.S.A. 60-250(b) alternative motion for a new trial and attached the affidavit of Juror A.S. in support of the motion. In this way, Lawton's procedural posture precipitated the court's discussion regarding jury recall. Williams also attached juror affidavits to support his opposition to Lawton's request for a new trial. Further, Lawton's attorney made an oral motion to recall the jury, stating, "I did not ask for it [recall] in the brief [on the motion for a new trial] because I initially felt like the affidavit we had was sufficient. However, if the Court is not satisfied with the affidavit from [Juror A.S.], then I would request we recall an examination." See *Cornejo v. Probst*, 6 Kan. App. 2d 529, 532, 630 P.2d 1202, *rev. denied* 230 Kan. 817 (1981) ("The only purpose to be served by filing a motion for recall of the jurors would be to ultimately obtain a new trial on the basis of evidence presented at a hearing on the motion to support the allegation of juror misconduct."). Counsel for both parties then presented their respective and opposing arguments regarding why the jury's conduct was or was not improper. Only after consideration of the parties' arguments did the district judge order a jury recall.

As a result, although the district judge clearly indicated a willingness to act on its own and, in fact, characterized the action as occurring *sua sponte*, the judge acted after the defense motion, and an order was not entered until after the oral motion and hearing. Under those circumstances, Rule 181 was not violated, and we do not reach the broader question of whether a district judge can ever recall jurors *sua sponte*.

### c. Court Questioning of Jurors

Although the district judge's questioning of jurors without allowing counsel to ask questions was one of the certified questions, on petition for review of the Court of Appeals' decision the parties do not discuss the question to any great extent, mentioning the issue only briefly. We will not, therefore, discuss the issue at length. We agree with the Court of Appeals' conclusion that the district judge did not abuse his discretion when he restricted the questioning. Counsel for both parties were permitted to submit proposed questions to the court up to 5 days before the recall hearing, and counsel

was present during the hearing and able to consult with the court and make objections. Conduct of the hearing in this manner allowed the district judge to maintain control of the proceeding to prevent any feeling of harassment of the jurors. It is within the district judge's discretion to control the questioning and the format of an evidentiary hearing conducted after jurors are recalled. See, *e.g.*, *Singletary by and through Barnett Banks v. Lewis*, 619 So. 2d 351, 353-54 (Fla. Dist. App. 1993) (interview questions were submitted to the district judge by counsel, district judge interviewed jurors and allowed additional questioning and summary statements by counsel) .

### d. Jury Recall Warranted

Rather than faulting the procedure utilized, the Court of Appeals faulted the questions asked, concluding they invaded the thought processes of the jury. Closely related to this criticism is the Court of Appeals' conclusion that the district judge abused its discretion in granting a new trial.

The law governing impeachment of jury verdicts is founded on two competing considerations. On one hand, is the requirement that the case be decided solely on the evidence presented and the instructions given to a fair and impartial jury. To this end, K.S.A. 60-444(a) provides that a juror is allowed to testify as a witness "to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited in K.S.A. 60-441." On the other hand, there is a need for confidentiality of deliberation and verdict finality. Diehm, 65 St. John L. Rev. at 394; see Concannon, 52 J.K.B.A. 201. This need results in a conclusion that public policy forbids the questioning of a juror on the mental processes individual jurors used in reaching a verdict because "there is no possible way to test the truth or veracity of the answers." *Kincaid v. Wade*, 196 Kan. 174, 178, 410 P.2d 333 (1966). This policy is codified in K.S.A. 60-441, which prevents a court from considering any evidence that attempts to "show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or

her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

In balancing these competing policies, this court normally does not allow testimony or affidavits of jurors to impeach a verdict where it is not obvious from the verdict that the jury failed to follow jury instructions. *Jones v. Sigg*, 261 Kan. 614, 621, 930 P.2d 1077 (1997). Exceptions are recognized, however, if a jury intentionally disregards a court's instructions or violates one or more of the essential formalities of proper jury conduct. One such long-standing exception applies "where a juror alleges the jury entered into a conscious conspiracy to circumvent the deliberation process by engaging in conduct which produces a quotient verdict." 261 Kan. at 621-22 (citing *City of Ottawa v. Heathman*, 236 Kan. 417, 425, 690 P.2d 1375 [1984]).

The line between the exceptions and the general rule, which admittedly is thin and often difficult to discern, was discussed in *Verren v. City of Pittsburg*, 227 Kan. 259, 607 P.2d 36 (1980). Verren moved for a new trial because of jury misconduct and submitted the affidavits of two jurors, which stated that the jury had, contrary to the court's instructions, specifically included in the damages award an amount for attorney fees. This court observed that under K.S.A. 60-441 and K.S.A. 60-444(a) a juror may not impeach a verdict on any ground inherent in the verdict itself, and a juror may not divulge the considerations that personally influenced him or her in arriving at the verdict or the reasoning that led him or her to the final decision. 227 Kan. at 260.

The *Verren* court then stated there are certain formalities of conduct which a jury is required to follow. The jury's failure to obey these essential formalities of conduct can invalidate its verdict, and evidence may be offered to impeach a verdict when the evidence will show the jurors intentionally disregarded the court's instructions or violated one or more of the essential formalities of proper jury conduct. 227 Kan. at 261. The *Verren* court explained that to guard against invading the mental processes of a juror, it must be proven that there was a conscious conspiracy by the members of the jury to disregard and circumvent the instructions on the law given by the court. If affidavits of jurors state these circum-

stances, the truth and veracity of those testifying to such misconduct can and should be tested before a verdict is set aside. 227 Kan. at 262.

Applying these general principles, the *Verren* court noted that it was not evident from the verdict that the jury had failed to follow instructions, but there was evidence the jurors "conspired together so as to circumvent the comparative negligence law." 227 Kan. at 263. Such a conspiracy, the court noted, could only be discovered by posttrial questioning of the jurors to determine how they reached their verdict.

Thus, under *Verren*, where a jury recall is based on a juror's affidavit, the matters set forth in the affidavit, if proven, must establish a conscious conspiracy by the members of the jury to disregard and circumvent the district judge's instructions on the law. Relying on *Verren*, this court explained in *Heathman*, 236 Kan. at 420: "[S]ince the jurors operate as a unit, public policy demands that misconduct insofar as possible be discouraged. Courts, therefore, have allowed inquiry into physical matters and misconduct which come to the attention of other members of the jury panel and may be verified or denied."

Implementation of these concepts in the context of a quotient verdict is illustrated by *Heathman*. In that eminent domain case, the landowners filed a motion for new trial and supported the motion with an affidavit of one of the jurors. The affidavit indicated: " 'The jury members agreed that they would each put down on an individual piece of paper what they felt the damages were to the Heathman property. Those individual figures would be added and totaled, divided by six, and those were the damages they would be bound by,' " 236 Kan. at 418, and the jury foreman suggested the "before value" of the property.

All six members of the jury were called to testify at a hearing on the motion. Each juror testified that he or she wrote on separate slips of paper the amount to be awarded Heathman in damages. The amounts the jurors had written on the slips of paper were then added together, the total divided by six, and then the average was rounded off to the nearest dollar. Four jurors testified there had been no agreement in advance by the jury to be bound by the final

figure, and two jurors thought there had been such a prior agreement. All jurors agreed without any discussion to use the amount the jury foreman suggested for the value before the taking.

Although the district judge found the jury did not reach a quotient verdict, the court did find that the jury failed to follow its instruction as to the method for determining damages and, in doing so, acted contrary to the law for condemnation cases. The district judge granted the motion for a new trial.

On appeal, this court affirmed the district judge's decision to grant a new trial. We stated: "Based on the affidavit by the juror that the jury had failed to discuss the issues and deliberately disregarded the court's instructions on the method of determining damages, the trial court acted properly when it questioned the jurors." 236 Kan. at 425-26.

In the present case, the affidavit of Juror A.S. indicated that the jury had agreed to reach a verdict by averaging all the jurors' opinions and that the jury had considered Williams' possible lack of insurance and his responsibility for attorney fees. Hence, the affidavit raised the specter of a conscious conspiracy to disregard and circumvent the court's instructions.

With respect to allegations of jury misconduct due to a quotient verdict, it must be emphasized that mere allegations of "averaging" do not establish an impermissible quotient verdict; jurors may average their suggested verdict so long as there is no prior agreement to be bound by the result of mathematical computation. *Merando v. A.T. & S.F. Rly. Co.*, 232 Kan. 404, 408, 656 P.2d 154 (1982); see *Siruta v. Hesston Corp.*, 232 Kan. 654, 669, 659 P.2d 799 (1983); *Blevins v. Weingart Truck & Tractor Service*, 186 Kan. 258, 263-65, 349 P.2d 896 (1960). It is the agreement to be bound in advance by the average figure that "is the evil which courts have found objectionable and which impeaches the verdict and subverts the deliberative process by which jurors must arrive at their verdict. [Citations omitted.]" *Merando*, 232 Kan. at 408; see *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 477-78, 856 P.2d 906 (1993) (impermissible quotient verdict is one in which " 'the jurors agree in advance to return as their verdict the amount obtained by averaging the figures each juror records as his verdict and subse-

quently returns a verdict that is the direct product of such an agreement.' ").

In *Blevins,* this court explained:

"The jurors are as much entitled to strike a quotient to see what their average thinking is, to serve as a working basis, as they are to let each juror give his suggested verdict orally and permit some member of the jury to strike a rough quotient by mental arithmetic. So long as there is opportunity for full discussion and deliberation concerning the question of damages, and so long as each juror gives his own independent agreement to the sum arrived at, after he knows what the sum is, there is no misconduct and no ground for a new trial. And this rule applies even though the verdict returned was exactly or nearly the amount of the quotient." 186 Kan. at 264.

Where, however, there is an advance agreement made before any juror can possibly know the ultimate figure to which the jury has been committed, the verdict is infirm as a "gambling" verdict. 186 Kan. at 263-64.

The critical determination, therefore, is whether the jurors agreed in advance to return as their verdict the amount obtained by averaging the figures each juror records as his or her verdict and to thereafter refuse to reexamine or discuss the amounts of damages or the percent of liability. See, *e.g., Jones,* 261 Kan. at 620. Here, the affidavit of Juror A.S. provided evidence of an antecedent agreement of the jurors to be bound by the averaging process—to be bound by the "quotient." Such misconduct on the part of the jury, if established, requires the verdict to be set aside. Plus, other jury misconduct was alleged as well, involving the improper consideration of insurance and attorney fees. See, *e.g., State v. Scott,* 286 Kan. 54, 103, 183 P.3d 801 (2008) (following jury verdict, defendant filed motion for new trial, arguing several jurors had improperly read from the Bible and other religious materials during deliberations; the trial court decided it was appropriate to recall the jurors and hold a hearing). The averments made in this case provided a legitimate basis for the jury recall.

In addition, these subjects were valid areas of inquiry by the district judge, as he probed whether the jury had disregarded instructions. The overall focus of his questions was consistent with the type of questions this court has allowed in past cases, *i.e.,* ques-

tions focused on whether the jurors followed the instructions and whether they have agreed in advance to be bound by the averaging technique of a quotient verdict. We have specifically held that these areas of inquiry do not delve into the impermissible area of an individual juror's mental processes. *Verren*, 227 Kan. at 263; see *Johnson v. Haupt*, 5 Kan. App. 2d 682, 686, 623 P.2d 537 (1981). Hence, we disagree with the Court of Appeals majority's conclusion that the judge's questions were improper.

The Court of Appeals majority also concluded that the district judge should have first heard the testimony of Juror A.S. before recalling the other jurors. We find no requirement for such a procedure, and the Court of Appeals cites none. Hence, it would seem that the process would be within the district judge's discretion, *i.e.*, the judge had discretion to conduct a limited hearing or to proceed to a full hearing. We find no basis for concluding that the district judge abused his discretion in moving to a full hearing, especially in light of the fact that Juror A.S.'s affidavit established a basis which, if proven, justified a new trial. See *Cornejo*, 6 Kan. App. 2d at 532.

Consequently, we cannot conclude that the district judge abused his discretion in finding that a jury recall was warranted or in the manner he conducted the evidentiary hearing.

### 3. New Trial

Next, Lawton contends that the Court of Appeals erred by reversing the district judge's order granting a new trial. He argues the Court of Appeals erroneously reweighed the evidence in determining the jury's verdict was not a quotient verdict and disregarded the district judge's alternative grounds for granting a new trial.

*General Principles*

Jury misconduct will not justify the granting of a new trial unless the misconduct is shown to have substantially prejudiced a party's rights. *State v. Cook*, 281 Kan. 961, 966, 981-82, 135 P.3d 1147 (2006); *State v. Hopkins*, 257 Kan. 723, Syl. ¶ 2, 896 P.2d 373 (1995); *State v. Goseland*, 256 Kan. 729, 735, 887 P.2d 1109 (1994).

A party claiming prejudice has the burden to prove prejudice. *State v. Fulton*, 269 Kan. 835, Syl. ¶ 1, 9 P.3d 18 (2000). The determination of whether a new trial is warranted is reviewed for an abuse of discretion. *Heathman*, 236 Kan. 417, Syl. ¶ 1.

When the allegation is that the prejudice arises because the jury reached a quotient verdict, this court has previously held in *Foster v. City of Augusta*, 174 Kan. 324, 331, 256 P.2d 121 (1953):

"It is a rule of this court that whether a verdict was or was not a quotient verdict is a question of fact for the trial court to determine (*Fitch v. State Highway Comm.*, 137 Kan. 584, 587, 21 P.2d 318; *Claggett v. Phillips Petroleum Co.*, [150 Kan. 191,] 201, 202 [, 92 P.2d 52 (1939)]), and the judgment having been entered and approved by the trial court in the instant case, this court will not disturb the judgment on that account."

Because the determination of whether there is a quotient verdict is a question of fact, an appellate court reviews the district judge's findings to determine if the findings are supported by substantial competent evidence. Substantial evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion. *Bellamy v. State*, 285 Kan. 346, 354-55, 172 P.3d 10 (2007); *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007);. In determining if that standard has been met, an appellate court examines the record to determine whether substantial competent evidence supports the district judge's findings, not to find evidence which would overturn the district judge's findings that the jury's verdict was or was not a quotient verdict. *Morrison v. Kansas City Coca-Cola Bottling Co.*, 175 Kan. 212, 221, 263 P.2d 217 (1953).

The appropriate application of this standard when, as in this case, there is conflicting evidence about whether there was a quotient verdict can be found in a Florida Court of Appeals case, *Niebla v. Flying Tigers Line, Inc.*, 533 So. 2d 816 (Fla. Dist. App. 1988). In that case, at a hearing after the jury was recalled, some jurors testified that they did not agree to be bound by a quotient verdict. Others could not recall such an understanding. Still others clearly and distinctly testified that the jurors did consent in advance to be bound by a quotient verdict. Despite the conflicting testi-

mony, the trial court found that the jury had reached a quotient verdict and granted a new trial.

Considering the plaintiff's appeal from that order, the Florida Court of Appeals held it was bound by the trial court's determination. 533 So. 2d at 816. Stating that the trial court is authorized to resolve conflicts in the evidence in order to determine whether the jury's decision was the product of a quotient verdict, the Florida Court of Appeals refrained from reweighing the evidence and observed that the trial court found there was a preliminary agreement or understanding among the jurors that each would select a figure as representing his or her opinion of the value of damages and that the sum of those amounts divided by the number of jurors would be accepted as the verdict and that amount was, in fact, accepted by the jury. The Florida Court of Appeals held, therefore, the jury rendered an improper verdict, which constituted a ground for a new trial. 533 So. 2d at 816-17; see also *Producers Chemical Company v. McKay*, 348 S.W.2d 91, 99 (Tex. Civ. App. 1961) (trial court's implied findings on issue of jury misconduct where such findings were made from conflicting testimony of jurors was binding on appellate court).

Here, the district judge carefully weighed the testimony of each juror who testified. In its memorandum order granting a new trial, the court stated: "Given that some of the jurors believed in advance that they would be bound by the quotient, the court finds that not all the jurors gave their own independent agreement to the verdict . . . , even though they were given the opportunity to say whether they disagreed with the tally." The district judge continued:

"Accordingly, because . . . some of the jurors believed they had agreed before taking the average that the average would be the verdict of the jury, because the court has found that there was not an opportunity for full discussion and deliberation of the . . . total and because the court has found that not all the jurors gave their own independent agreement to the . . . tally, the court finds the jury's verdict on the issue of percentage fault was an improper quotient verdict."

There is substantial competent evidence to support these conclusions. The testimony of at least four jurors indicated that there was an advance agreement that the number resulting from the

tallied average would be the verdict of the jury. And some jurors' testimony showed there was a brief vote to confirm that the jurors agreed with the resulting number, but there was no discussion on the matter. Therefore, not only did the affidavit of Juror A.S. provide the first-hand observation of an agreement to submit the tallied average as the verdict, but the testimony of several other jurors confirmed this as well.

The Court of Appeals recognized the fact-based nature of the determination of whether there was a quotient verdict but stated "we are able to apply well-established legal principles to the undisputed evidence and the findings of the district judge without reweighing the testimony of individual jurors." 38 Kan. App. 2d at 583. In doing so, the Court of Appeals stated that it was undisputed that only some of the jurors agreed to the quotient verdict.

The differences in the jurors' testimony had been noted by the district judge, who added that he had "closely looked at and listened to each juror as they testified." From that testimony, he concluded there was a quotient verdict and an agreement to limit deliberations. While we agree with the Court of Appeals that the district judge could have weighed the evidence differently, our role is not to seek out evidence contrary to the district judge's findings or to focus on evidence contrary to those findings.

We note, however, that the Court of Appeals seemed to be legitimately concerned that the district judge focused on the mental processes of individual jurors rather than the agreement of the entire jury to be bound by the quotient. Indeed, there is some ambiguity in the district judge's findings in this regard. Nevertheless, in concluding his findings, the district judge clearly and unambiguously found that "there was not an opportunity for full discussion and deliberation of the" number determined by averaging each juror's suggested verdict. This finding addresses the "evil" of quotient verdicts, i.e., the lack of an "opportunity for full discussion and deliberation" and the inability for "each juror [to give] his own independent agreement to the sum arrived at, after he knows what the sum is." *Blevins*, 186 Kan. at 264.

The Court of Appeals majority stated an additional rationale for its conclusion that the district judge erred in finding jury miscon-

duct when it focused on evidence that the jurors took a confirming vote after the quotient verdict was calculated. This analysis ignores authority in support of the position that, once the jurors have made their antecedent agreement and have obtained the quotient, their subsequent ratification of the quotient, even though accompanied by some brief discussion, will not cure the verdict of its invalidity if the amount of the verdict is based upon the jury's view of the quotient process. "[A] subsequent polling of the jury does not diminish the harm already caused by the agreement." *Johnson*, 5 Kan. App. 2d at 686; see also *Klein v. Swift & Co.*, 248 Iowa 563, 569, 81 N.W.2d 469 (1957) ("[N]or can a quotient verdict be cured by the [jurors] subsequently adopting it or its equivalent as their verdict, if the agreement entered into or controlled the subsequent adoption of the verdict returned"); *Central Motor Co. v. Gallo*, 94 S.W.2d 821, 823 (Tex. Civ. App. 1936) (finding little importance to evidence that jury voted on and adopted the quotient as tallied; "It merely evidenced a continued willingness to adopt an improper method for determining the extent of liability."). Here, the district judge specifically found that there was no opportunity for meaningful discussion after the tally when the quotient verdict was calculated.

Ultimately, when the question of whether there was a quotient verdict is raised, the district judge must weigh the evidence to determine if there was an antecedent agreement that invalidates the jury verdict. Here, although conflicting, there was evidence that the jury agreed in advance to be bound by the tallied average. Because it is the duty of the district judge, not an appellate court, to resolve conflicts in evidence and because substantial competent evidence supports the district judge's findings that there was an improper quotient verdict, those findings are affirmed. See *Bellamy*, 285 Kan. at 354-55; *Morrison*, 175 Kan. at 221.

Under the circumstances, it is unnecessary to address Lawton's contention that the Court of Appeals erred by disregarding the district judge's alternative grounds for granting a new trial—the cumulative effect of the jury's usage of an extrapolated verdict and quotient verdict, consideration of attorney fees, and consideration of insurance. We note, however, that the district judge found the

evidence of other jury misconduct was "not enough to independently warrant a finding of substantial prejudice to the rights of Lawton to a fair and impartial trial."

The remainder of the district judge's analysis—that the quotient verdict prejudiced Lawton and he is thus entitled to a new trial—was an appropriate exercise of the district judge's discretion.

The Court of Appeals erred by reversing the order granting a new trial.

### 4. Expert Qualifications

Finally, Lawton contends the plaintiff's expert, Dr. Diggdon, failed to meet the criteria set forth in K.S.A. 60-3412 and, therefore, the district judge court abused his discretion in admitting Diggdon's testimony and in rejecting this basis for a new trial. Williams argues the trial court did not misinterpret the statute and applied it correctly. The Kansas Association of Defense Counsel, in its *amicus* briefs, supports Dr. Lawton's position.

The interpretation of a statute is a question of law over which an appellate court has unlimited review. The fundamental rule of statutory interpretation requires courts to give effect to the intent of the legislature as expressed. Thus, when the language of a statute is plain and unambiguous, a court must give effect to that language rather than determine what the law should or should not be, speculate as to legislative intent, add something not readily found in the statute, resort to canons of statutory construction, or consult legislative history. *In re Adoption of A.A.T.*, 287 Kan. 590, 627, 196 P.3d 1180 (2008), *cert denied* 556 U.S. 1184 (2009).

K.S.A. 60-3412 provides:

"In any medical malpractice liability action, as defined in K.S.A. 60-3401 and amendments thereto, in which the standard of care given by a practitioner of the healing arts is at issue, no person shall qualify as an expert witness on such issue unless at least 50% of such person's professional time *within the two-year period* preceding the incident giving rise to the action is devoted to actual clinical practice in the same profession in which the defendant is licensed." (Emphasis added.)

The facts relevant to the application of this statute establish that Williams' surgery was performed on February 1, 2002, and he first saw Dr. Lawton on January 24, 2002. The district judge concluded

the incident, for purposes of K.S.A. 60-3412, occurred February 1, 2002. At that time, Dr. Diggdon, who was 74 years old when he testified, had retired from his clinical practice entirely on October 31, 2001, approximately 3 months before Williams' surgery. A physician since 1958 and a board-certified urologist since 1968, Diggdon had performed thousands of surgeries like the one performed on Williams, including "probably in the hundreds, high hundreds" on adult patients. According to Diggdon's testimony at deposition and trial, when he practiced full-time he saw up to 70 patients per week. Between January 24, 2000, and October 31, 2001, he saw patients in his office or a clinic. In January 2000, Diggdon worked all day on Mondays and half-days on Tuesdays, Wednesdays, Thursdays, and Fridays. During 2000, he saw 6 to 12 patients per day; the numbers dwindled with health-care reimbursement cutbacks. Diggdon indicated that he had testified as an expert in other cases prior to this case; he had forensically reviewed approximately 28 cases over a 2-year period before the trial.

The district judge concluded that Diggdon qualified as an expert under K.S.A. 60-3412 and gave the following explanation in his memorandum opinion:

"From January 1, 1997 to October 31, 2001, Dr. Diggdon was engaged in clinical practice, seeing patients in his office. During this time period, Diggdon'[s] office was open all day on Mondays, and four hours per day on Tuesdays, Wednesdays, Thursdays, and Fridays. Diggdon testified, in trial or at deposition, that by February 2000, he was seeing approximately 6 to 12 patients per day. Importantly, Diggdon testified that the drop in patients was due to the fact patients stopped coming. He said that the drop in patients was not due to any desire to see fewer patients.

"Dr. Diggdon testified at trial that if one totaled all the hours he spent in clinical practice seeing patients in the office in the two years before February 1, 2002, even counting the months of no clinical patients from October 31, [2001] to February 1, 2002, he spent more than 50 percent of his time in actual clinical practice. In addition, Diggdon testified that more than fifty percent of his total income during that same two year period came from actual clinical practice."

Lawton argues that Diggdon was not qualified because for approximately 3 months preceding this incident, he had no clinical practice and spent 100 percent of his professional time as an expert witness and Diggdon was seeing patients on a part-time basis for

the remainder of the 2 years preceding October 31, 2001. Lawton contends that K.S.A. 60-3412 requires that a physician witness be a full-time professional throughout the 2-year period *and* devote 50 percent of his or her time to clinical practice.

The Court of Appeals found that K.S.A. 60-3412 clearly instructs the trial court to look at the entire 2 years preceding the incident and determine if at least 50 percent of the expert witness' professional time was spent on clinical practice. 38 Kan. App. 2d at 574. Examining the record, the Court of Appeals determined the evidence supported the district judge's finding that Diggdon spent at least 50 percent of his professional time during the 2 years preceding the incident on his clinical practice, "notwithstanding the fact of his retirement . . . immediately prior to the incident and his full-time consulting thereafter." 38 Kan. App. 2d at 574.

As observed by the Court of Appeals, Lawton relies on legislative history suggesting that "hired guns" or "professional witnesses" who do not maintain a clinical practice were not intended to meet the statutory qualification requirements. See *Wisker v. Hart*, 244 Kan. 36, 43-44, 766 P.2d 168 (1988) (Statute "is intended to prevent the use of 'professional witnesses.' That is, practitioners of healing arts who spend less than 50 percent of their professional time in actual clinical practice in their profession are considered to be 'professional witnesses' rather than practitioners of their profession."); *Endorf v. Bohlender*, 26 Kan. App. 2d 855, 864, 995 P.2d 896, *rev. denied* 269 Kan. 932 (2000) (same). Yet we need not delve into legislative history because the language of K.S.A. 60-3412 is not ambiguous. See *Board of Leavenworth County Comm'rs v. Whitson*, 281 Kan. 678, 685, 132 P.3d 920 (2006) (resort to legislative history or statutory construction rules to ascertain legislative intent is appropriate only when a plain reading of the text of the statute yields an ambiguity or lack of clarity).

There is no requirement in the plain language of K.S.A. 60-3412 that the proposed expert witness devote any specific amount or percentage of his or her time to the professional practice of the healing arts at issue. In other words, there is no full-time professional practice requirement. The statute merely requires that at least 50 percent of "such person's professional time within the two-

year period preceding the incident" be "devoted to actual clinical practice," *i.e.*, patient care. *Dawson v. Prager*, 276 Kan. 373, 375-76, 76 P.3d 1036 (2003).

Furthermore, contrary to Williams' argument, there is no language that requires the witness be continuously engaged in actual clinical practice during the entire preceding 2-year period. In other words, there can be a lapse in providing patient care without there being an automatic disqualification. The 2-year time period merely identifies the time parameters for applying the 50-percent time test. See Webster's II New College Dictionary 1268 (2001) (defining "within" to mean "[i]nside the limits or extent of" or "[i]nside the fixed limits of; not beyond"); *see also Dawson*, 276 Kan. at 383 (ordinary words are given their ordinary meaning in defining professional time devoted to actual clinical practice within 2 years preceding incident).

Hence, under K.S.A. 60-3412, the appropriate test to determine if a proposed medical malpractice liability expert witness is statutorily qualified to testify as to the applicable standard of care is to examine the 2 years preceding the incident giving rise to the suit to determine if during that time, when considered as a whole, the proposed expert devoted more than 50 percent of his or her professional time to actual clinical practice in the healing art at issue. This was the test applied by the district judge, and the Court of Appeals correctly upheld the decisions to admit the expert testimony at trial and to reject the admission of the expert testimony as a basis for a new trial.

The Court of Appeals' decision affirming in part but reversing in part the district court is affirmed in part and reversed in part. The judgment of the district court is affirmed, and the case is remanded to the district court with directions to proceed with a new trial.